**In re THE BIBLE SPEAKS, Debtor.**

**Bankruptcy No. 86–40392–JFQ.**

United States Bankruptcy Court,
D. Massachusetts.

Oct. 8, 1986.

Gordon T. Walker, Eric R. Dannemaier, McDermott, Will & Emery, Boston, Mass., for Elizabeth Dovydenas.

Norman Roy Grutman, Grutman, Miller, Greenspoon & Hendler, New York City, Charles W. Morse, Jr., Sullivan & Worcester, Boston, Mass., for The Bible Speaks.

OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

This case presents the important question of whether or not a debtor may request reorganization under Chapter 11 of

the Bankruptcy Code for the primary purpose of resolving a serious dispute with a third party which is pending in the state courts. Elizabeth Dovydenas ("Mrs. Dovydenas") moves to dismiss this Chapter 11 proceeding pursuant to 11 U.S.C. § 1112(b) on the ground that it was filed in "bad faith." Alternatively, she moves that the Court either abstain, pursuant to 28 U.S.C. § 1334(c), from hearing litigation pending in the state courts between the parties, or terminate the automatic stay now in effect under 11 U.S.C. § 362 in order to permit that litigation to continue. The Chapter 11 debtor in possession, The Bible Speaks (the "Debtor"), opposes the motion on its merits and contends that Mrs. Dovydenas does not have standing as a "party in interest" to bring this motion under 11 U.S.C. § 1112(b). The Court has held an evidentiary hearing on the motion. For the reasons set forth in this opinion, which contains both the Court's findings of fact and conclusions of law, the motion is denied.

## I. Factual Background

The Debtor is a corporation having a tax exempt status as a religious and educational organization. In the words of its president and pastor, the Debtor is a "Christ-centered, bible-believing, fundamentalist church." It operates two educational facilities at its headquarters in Lenox, Massachusetts: The Stevens School of the Bible, which enrolls some 550 adults, about half of whom board at the school; and Stevens Christian School, a private day school for children in Kindergarten through the twelfth grade which enrolls about 300 students. The Debtor has approximately 1,200 local parishioners and supports programs of missionary work in numerous foreign countries. It conducts a daily radio program in the form of an hour-long "talk-show" concerning religious education which is broadcast throughout the country. It has about 200 employees. It has a relationship with a number of autonomous religious organizations, referred to as "affiliated ministries," which are located in 12 states and 18 foreign countries. These affiliated ministries also use the name "The Bible Speaks."

Mrs. Dovydenas became a parishioner of the Debtor in 1982. During a period ending in December, 1985, she transferred to the Debtor money and stock of the Dayton-Hudson Company having a total value of approximately $7,000,000. In January of 1986 Mrs. Dovydenas began seeing a so-called "exit counselor" who counsels individuals in the process of leaving religious organizations. At about the same time, she consented to the institution of a temporary conservatorship proceeding in which a court appointed her father, Wallace C. Dayton, and a bank as temporary conservators. During this temporary conservatorship proceeding, which expired the following April, the conservators examined officers of the Debtor concerning the cash and security transfers.

On April 14, 1986 the Debtor filed a complaint in a state court against Mrs. Dovydenas, her husband and her father seeking damages and a declaratory judgment that the transfers were not the result of fraudulent acts, misrepresentations or improper influence of the Debtor's officers or representatives. This suit was dismissed without leave to amend by a Memorandum of Decision and Order dated June 13, 1986, and judgment on the dismissal was entered June 20, 1986. On July 1, 1986 the same court denied the Debtor's motion to vacate. The Debtor has appealed from the dismissal of its complaint.

On June 18, 1986, shortly after dismissal of the Debtor's complaint for declaratory judgment but before entry of judgment, Mrs. Dovydenas brought suit in the same state court seeking damages and rescission of the transfers on the grounds of lack of donative intent, undue influence and fraud. She claimed a trial by jury and joined as defendants Carl H. Stevens, Jr. ("Stevens"), who is the Debtor's president and pastor, and Kathleen Hill, an employee of the Debtor. Mrs. Dovydenas alleged, *inter alia:* that she had developed an "intense emotional dependence" upon the individual defendants; that she maintained an "inti-

mate and confidential" relationship with them; that they counseled her to maintain secrecy from her husband and family concerning her financial dealings with the Debtor, to make a vow of loyalty only to Stevens and the Debtor, and to make substantial gifts to the Debtor; that she was incapable of understanding the significance of the financial transactions; and that the defendants misrepresented to her the purposes for which the donations would be used and the Debtor's need for the funds. At the time of the filing of .the complaint counsel for Mrs. Dovydenas also filed interrogatories to be answered by the Debtor and Stevens together with a notice of the deposition of the Debtor, Stevens and others.

The Debtor moved to dismiss the complaint on the ground that the declaratory judgment action was still pending by reason of the pendency of the appeal from its dismissal. At the same time the Debtor moved for a protective order to stay discovery pending the appeal. At the hearing held on July 16, 1986 the state court denied the motion to dismiss and the motion for a protective order. A discovery schedule was then worked out by the parties and approved by the court.

At the July 16, 1986 hearing in the state court, the Debtor also moved to admit its New York attorney, Norman Roy Grutman, *pro hac vice* to practice before the Massachusetts courts with respect only to that litigation. Mrs. Dovydenas opposed this motion, alleging obstructive conduct on the part of Mr. Grutman during that litigation and during the prior conservatorship proceeding. The state court judge declined to admit Mr. Grutman *pro hac vice*. Instead, the court allowed him to appear for a limited time on the condition that he complete and file a formal application for admission to the Massachusetts bar by August 28, 1986. The Debtor appealed from this order. It subsequently advised the state court judge that pending the appeal it would abide by the Court's ruling and that because of complexities in the application process it was not possible for it to file a completed application for Mr. Grutman's

admission to the Massachusetts bar by August 28th.

On July 29, 1986 the Debtor filed a petition with this Court seeking reorganization under Chapter 11, 11 U.S.C. §§ 1101–1174. Stevens and Kathleen Hill have also filed petitions with the Court requesting relief under Chapter 13, 11 U.S.C. §§ 1301–1330. The Debtor has moved the admission of its attorney, Norman Roy Grutman, *pro hac vice* to practice before this Court. The Court has so admitted Mr. Grutman, who is a member of the bar of the Southern District of New York.

Mrs. Dovydenas attacks this Chapter 11 filing on the ground that the petition has been filed in "bad faith." She alleges that the Debtor filed its petition solely for the purposes of changing the forum in which her claims are to be tried and denying her the right to a jury trial. She asserts that the Debtor neither needs a Chapter 11 reorganization nor intends to effect a plan or reorganization, and that it is trying to manipulate bankruptcy remedies. The Debtor, on the other hand, disputes the charge of bad faith and contends that the Dovydenas claim poses a grave threat to its survival. It argues that when this claim is considered in conjunction with the Debtor's present working capital position, a picture emerges of an organization that is in dire need of the remedies available under Chapter 11.

In its schedules filed with this Court, the Debtor lists assets having a book value of $5,902,449, (of which $4,858,000 is real estate) and liabilities of $7,667,024 broken down as follows: wages having priority—$28,588; taxes owing states—$158; deposits received for future services or undelivered purchases—$30,093; secured claims—$304,436; and unsecured claims—$7,303,749, of which $7,038,825 is the disputed Dovydenas claim. Over 250 creditors are listed, more than half of whom are students who had made deposits for room, board or tuition. The Dovydenas claim and one other claim in litigation are described as "disputed, unliquidated and contingent."

There was no testimony concerning the specific fair market value of the Debtor's real estate. However, it is clear that the value of this real estate is substantially in excess of its book value, which merely represents historic cost less depreciation. The Lenox property, which is carried at a book value of approximately $3,500,000, was purchased in 1976. The Court takes judicial notice of the general increase in real estate values in Berkshire County since then. Moreover, the certified public accountant who testified for the Debtor readily conceded on cross examination that the fair market value of the Debtor's real estate significantly exceeded its book value.

A description of the Debtor's liquid position requires some elaboration. As of the time of the filing of the Chapter 11 petition, the Debtor had cash and other liquid assets amounting to $114,426 and owed debts presently payable in excess of $240,-000. It also had "restricted funds" consisting of funds which were donated for specific purposes. These funds include about $200,000 remaining from a December, 1985 donation of Mrs. Dovydenas which had been restricted for the purchase of television equipment and the production of television programs. The Debtor's working capital position had deteriorated during the months prior to the Chapter 11 filing for three reasons: operational losses, payment of a $500,000 legal retainer in the Dovydenas litigation, and expenditures of substantially more than that amount in construction projects at its Lenox facilities for which it had made previous commitments.

Beginning in June of this year, the Debtor sought a $200,000 loan from a local bank, offering as security its unencumbered real estate in Lenox which has a book value of approximately $3,500,000. The same bank had previously made a loan secured by this real estate which had been paid in full in 1985 by two lump sum payments totaling $592,496. The Debtor had six meetings with the bank. As of the Chapter 11 filing date, the bank had neither granted nor denied the loan. The bank expressed concern about the Dovyde-

nas litigation, and told the Debtor that before making a decision it wished to review the Debtor's financial statements for the fiscal year ending July 31, 1986, which of course were not then available. The Debtor is now seeking to raise money by selling two Florida properties having a net equity value of about $410,000. Buyers have not yet been found for these properties. Other real estate owned by the Debtor in Maine and New York is used for church purposes and as bible schools by autonomous affiliated ministries.

The Debtor's current revenues and expenses are such that its expenses will have to be greatly reduced in order for it to break even for the current fiscal year ending July 31, 1987. During its fiscal year ending July 31, 1986, it sustained a net loss of $820,000 based upon gross revenues of $4,305,000 derived from room, board and tuition, donations, fundraising, student union revenues, printshop revenues, and other miscellaneous income. Included as income in arriving at this net loss is $567,000 in fundraising from Mrs. Dovydenas and investment income of $218,000 which was largely generated from temporary cash balances resulting from Dovydenas donations. Also reflected in the $820,000 net loss is a $500,000 retainer paid in connection with the Dovydenas litigation. Thus if these non-recurring items are eliminated, fiscal 1986 would show a net loss of approximately $1,105,000. This net loss is subject to some reduction for future planning purposes because the fiscal 1986 figures include, to an undetermined extent, some non-recurring expenses that were related to capital improvements.

In June of 1986 the Debtor hired the accounting firm of Coopers & Lybrand in connection with the pending Dovydenas litigation for the purpose of tracing the amounts, dates, and expenditures of the Dovydenas donations, and also for assistance in improving the Debtor's financial procedures. A partner of that firm opined at the hearing, and the Court so finds, that the solution to the Debtor's cash flow problems will require both an increase in reve-

nues and a decrease in operating and administrative expenses. One problem faced by the Debtor is that its expenses have increased during the period of the Dovydenas donations. With these donations having now come to an end, different budgeting is required. The Debtor has already made several reductions in staffing as well as expense levels, and it is now engaged in a formal budget process, aided by a new "mini-computer" system. The accountant was also of the opinion, and the Court so finds, that the Debtor is "within striking distance" of a balanced budget for the fiscal year ending July 31, 1987. The conclusion that the Debtor is likely to bring expenses into line with revenues is enforced by a review of the Debtor's financial statements for fiscal years 1981 through 1985. These financial statements disclose that the Debtor has the ability to operate at or around a break even point.

I make no finding concerning insolvency in the so-called "bankruptcy sense," which is defined in § 101(29) of Title 11 of the United States Code (the "Bankruptcy Code") as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation" (exclusive of any exempt property and certain property which has been fraudulently transferred). I refrain from doing so for three reasons. First, there was insufficient evidence to support such a finding. No expert witness testified as to the fair market value of the Debtor's real estate and other assets. Moreover, a finding concerning this form of insolvency would require a valuation of the Dovydenas claim. This estimation could be done, even under a summary bankruptcy estimation procedure, only after a more sustained examination into the merits of the claim than that which took place during the two day evidentiary hearing held on this motion. Finally, as discussed below, there is no statutory requirement that a debtor in either a voluntary or an involuntary Chapter 11 proceeding be insolvent in the bankruptcy sense.

I do find that as of the petition filing date the Debtor was insolvent in the "equi-ty sense," that is, that the Debtor was then unable to pay its debts as they mature. I also find that this financial condition is unlikely to extend beyond approximately the next six months, the estimated time which the Debtor will need to sell excess assets and bring its expenses into line with income. The present insolvency has not been self-inflicted in order to seek the protection of this Court, as charged by Mrs. Dovydenas. The Debtor did spend substantial sums for capital improvements in the months prior to the filing. Whether or not most or all of the expenditures were required by prior contractual commitments, I am convinced that the Debtor did not do so as part of a scheme to bring about an inability to pay current debts. Nor did the Debtor pay a legal retainer to its attorney as part of such a scheme. If this litigation were to continue unbridled in the state courts, the total legal expense would be likely to consume the retainer.

The foregoing is a statement of the Court's essential findings of subsidiary facts as well as a few ultimate findings. Other subsidiary and ultimate findings are deferred to a discussion of the applicable legal principles.

We turn first to the Debtor's motion to dismiss.

## II. Bad Faith in General as a Ground for Dismissal

In charging that the Chapter 11 petition was filed in bad faith, Mrs. Dovydenas uses the phrase in both a factual and a jurisdictional sense. She alleges that the filing is but another step in a series of maneuvers designed solely to harass and delay her in pursuing her claim, and that the Debtor has no honest intent to seek a Chapter 11 reorganization. But she also alleges bad faith in the sense that the Debtor's financial condition does not justify a Chapter 11 reorganization, so that the Court lacks subject matter jurisdiction. Thus our inquiry on this issue has significant legal overtones.

Mrs. Dovydenas bases her motion to dismiss upon 11 U.S.C. § 1112(b). She contends that bad faith in filing is a proper "cause" for dismissal under that statute. § 1112(b) authorizes dismissal of a Chapter 11 case in the following circumstances:

[O]n request of a party in interest ... for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under [11 U.S.C. § 1121] within any time fixed by the court;

(5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or a modification of a plan;

(6) revocation of an order of confirmation under [11 U.S.C. § 1144], and denial of confirmation of another plan or a modified plan under [11 U.S.C. § 1129];

(7) inability to effectuate substantial consumation of a confirmed plan;

(8) material default by the debtor with respect to a confirmed plan; or

(9) termination of a plan by reason of the occurrence of a condition specified in the plan.

By statutory rule of construction, "including" is not limiting. 11 U.S.C. § 102(3). The legislative history indicates that the court is given "wide discretion" to dismiss or convert "whichever is in the best interest of creditors and the estate, only for cause." The legislative history also states: "The list is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." H.R.REP. No. 595, 95th Cong., 1st Sess. 406 (1977); S.REP. No. 989, 95th Cong., 2d Sess. 117 (1978), U.S. Code Cong. & Admin.News 1978, pp. 5787, 5903, 6362.

Thus there is no clear bar to a court treating a filing in bad faith as cause for dismissal. Yet a bad faith filing, particularly in the jurisdictional sense, is not an easy fit under the statute. The listed causes all seem to be based upon action or inaction on the part of a debtor during the pendency of a case rather than upon the debtor's financial condition at case commencement. Under the *ejusdem generis* rule of construction, any cause for dismissal not enumerated in the statute should consist of similar post-filing conduct. *See* 2A C.D. SANDS, STATUTES AND STATUTORY CONSTRUCTION § 47.17 (4th ed. 1973). Moreover, the absence of an express good faith standard in § 1112(b) is in marked contrast to the clear requirement under § 1129 that the debtor propose a plan in good faith. As a matter of pure statutory construction, therefore, one could infer that bad faith, at least in the jurisdictional sense, is not cause for dismissal under § 1112(b). These considerations prompted the court in *In re Century City, Inc.*, 8 B.R. 25 (Bankr.D.N.J.1980), to conclude that the dismissal of a Chapter 11 filing by a debtor with virtually no creditors should be based not upon § 1112(b) but rather upon the court's inherent equitable power under § 105(a) of the Bankruptcy Code, which gives the court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *Century City*, 8 B.R. at 30. That court also rejected the relevance of § 305 abstention authority, concluding from the legislative history that § 305 was primarily intended to permit completion of an arrangement with creditors that had been commenced out of court prior to the Chapter 11 filing. *Century City*, 8 B.R. at 29.

Section 1112(b) comes to us, however, with a good deal of baggage from the prior Bankruptcy Act, Bankruptcy Act of 1898, ch. 541, 30 Stat. 544 (codified as amended at 11 U.S.C. §§ 1–1200 (1976)) (repealed 1978). Under the various provisions of the former Bankruptcy Act, as they evolved through a series of amendments, good faith was in some instances an express requirement only for petition filing, in oth-

er instances only for confirmation, and occasionally the statute required good faith for both filing and confirmation. Section 12 of the original statute, dealing with compositions, required good faith only for confirmation. Bankruptcy Act of 1898, ch. 541, § 12(d)(3), 30 Stat. 544, 550 (July 1, 1898) (codified as 11 U.S.C. § 30(d)(3)) (amended and incorporated 1938). Section 74, which appeared in 1933, imposed the requirement for both filing and confirmation. Amendments to Bankruptcy Act of 1898, ch. 204, §§ 74(a) & (g)(4), 47 Stat. 1467, 1467–68 (March 3, 1933) (codified as 11 U.S.C. §§ 202(a) & (g)(4)) (amended & incorporated 1938). Yet Section 75 dealing with compositions by farmers appeared the same year and mentioned good faith only in connection with confirmation. *Id.,* § 75(i)(3), 47 Stat. at 1472 (codified as 11 U.S.C. § 203(i)(3)) (expired 1949). Section 77, dealing with railroad reorganizations and appearing the same year, specified good faith with respect to both filing and confirmation, *id.,* §§ 77(a) & (g)(3), 47 Stat. at 1474, 1479 (codified as 11 U.S.C. §§ 205(a) & (g)(3)) (repealed 1978), as did the 1934 amendment which inserted § 77B governing corporate reorganizations. Amendments to Bankruptcy Act of 1898, ch. 424, §§ 77B(a) & (f)(6), 48 Stat. 911, 913, 919 (June 6, 1934) (codified as 11 U.S.C. §§ 207(a) & (f)(6)) (amended & incorporated 1938). There was a mixed pattern under the Chandler Act Amendments of 1938. Under Chapter X, petition filing and plan proposals had to be made in good faith. Chandler Act Amendments of 1938, ch. 575, §§ 141 & 221(3), 52 Stat. 840, 887, 897 (June 22, 1938) (codified 11 U.S.C. §§ 541 & 621(3)) (repealed 1978). But the Chandler Act provisions creating Chapter XI only expressly required good faith in connection with plan proposal and acceptance, as did those creating Chapter XII and Chapter XIII. *Id.,* §§ 361, 467, & 651, 52 Stat. at 911, 923, & 934 (codified as 11 U.S.C. §§ 761, 867, & 1051) (repealed 1978).

Throughout this evolution in the prior Act the courts filled in the apparent gaps in the statute and expanded on the concept of good faith. It was decided early on under Chapter XI that petition filing as well as plan proposal and acceptance had to be made in good faith. *SEC v. U.S. Realty & Improvement Co.,* 310 U.S. 434, 455–57, 60 S.Ct. 1044, 1053–54, 84 L.Ed. 1293 (1940) (court can use good faith determination in Chapter XI filing pursuant to its equity powers to safeguard the public and private interests involved, as well as to protect its jurisdiction from misuse); *see In re Bolton Hall Nursing Home,* 432 F.Supp. 528 (D.Mass.1977) (applying Chapter X stardards of good faith to Chapter XI and Chapter XII filings). Various categories of bad faith emerged in the decisions, and the term began to be used as much in an objective jurisdictional sense as in a subjective factual sense. A number of decisions ordered dismissal for lack of good faith where the debtor had been recently formed in order to qualify as a type of entity eligible for relief under the applicable statute. *In re Metropolitan Realty Corp.,* 433 F.2d 676 (5th Cir.1970), *cert. denied* 401 U.S. 1008, 91 S.Ct. 1251, 28 L.Ed.2d 544 (1971) (Chapter X); *Milwaukee Postal Building Corp. v. McCann,* 95 F.2d 948 (8th Cir.1938) (§ 77B); *Quin v. North Kenmore Building Corp. (In re North Kenmore Building Corp.),* 81 F.2d 656 (7th Cir.1936) (§ 77B). Perhaps the most common case occurred when one or more creditors, usually secured, mounted a good faith argument which was essentially the reverse of that made by Mrs. Dovydenas here. They frequently requested and obtained dismissal on the ground that the debtor was in such dire straits there was no reasonable ground to believe that it had the ability to effect a reorganization under Chapter X or an arrangement under Chapter XI. *E.g., In re Ware Metal Products, Inc.,* 42 F.Supp. 538 (D.Mass.1941) (Chapter X); *see Ira Haupt & Co. v. Klebanow,* 348 F.2d 907 (2d Cir.1965) (Chapter XI); *Cf. SEC v. U.S. Realty & Improvement Co.,* 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940) (Challenge by federal agency to Chapter XI filing). *See generally In re Victory Construction,* 9 B.R. 549 (Bankr. C.D.Cal.1981), for a review of the good

faith requirement under the law prior to the 1978 Bankruptcy Code.

Based upon such precedents, much of the same jurisdictional judicial gloss has been placed upon § 1112(b) of the Bankruptcy Code. Courts have dismissed proceedings based upon an implicit good faith requirement of § 1112(b) where the debtor was recently formed for the express purpose of qualifying for relief under the Bankruptcy Code, without requiring a showing of prejudice to creditors from the recent formation. *E.g., In re 299 Jack-Hemp Associates*, 20 B.R. 412 (Bankr.S.D.N.Y.1982); *In re G-2 Realty Trust*, 6 B.R. 549 (Bankr.D.Mass. 1980). Chapter 11 petitions have also been dismissed, on the same authority, in the more prejudicial situation where the debtor's recent formation was accompanied by the transfer to it of only some of the assets of a preexisting organization. *E.g., In re Eden Associates*, 13 B.R. 578 (Bankr.S.D. N.Y.1981); *In re Dutch Flat Investment Co.*, 6 B.R. 470 (Bankr.N.D.Cal.1980).

Courts have also used an implicit good faith requirement under § 1112(b) as a means of protecting jurisdictional integrity, not because of the debtor's recent formation but because the debtor was not an organization with a business purpose other than to use a remedy available in Chapter 11. *In re Nancant, Inc.*, 8 B.R. 1005 (Bankr.D.Mass.1981); *Cf. In re Washington Funding Corp.*, 13 B.R. 216 (Bankr.E.D.N.Y.1981) (*Nancant* situation under the Bankruptcy Act).

■ Precedent has established, therefore, that § 1112(b) imposes a standard of good faith which includes a jurisdictional requirement as well as a prohibition against fraudulent conduct. In any event, this Court has an overriding duty to see that its jurisdiction is not exceeded. *In re Coastal Cable T.V., Inc.*, 709 F.2d 762 (1st Cir.1983). We turn first, however, to the factual allegations of bad faith.

### III. The Dovydenas Charge of Intent to Harass and Delay

Mrs. Dovydenas charges, first and foremost, that the petition was filed in bad faith because the predominant motive for the filing was to harass and delay her in the prosecution of her claim rather than to seek reorganization under Chapter 11. Although she does not invoke Bankruptcy Rule 9011, this factual branch of her bad faith argument involves essentially the same considerations as those encompassed by that rule, which is a restatement of Rule 11 of the Federal Rules of Civil Procedure. Bankruptcy Rule 9011 states in part that the signature of an attorney to a petition, pleading, motion or other document:

> constitutes a certificate by him that ... to the best of his knowledge, information, and belief formed after reasonable inquiry it is well founded in fact and is warranted by existing law or a good faith argument for extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass, to cause delay, or to increase the cost of litigation.

Violation of the rule authorizes the imposition of sanctions against the attorney, his client, or both.

Mrs. Dovydenas relies heavily upon the decision in *Furness v. Lilienfield*, 35 B.R. 1006 (D.Md.1983). There a defendant in litigation outside of the bankruptcy court engaged in a series of delaying tactics. He was fined for delay in responding to discovery requests. The sanction procedure prevented the trial from going forward as originally scheduled. A second trial date was set, and the defendant was given more than four months notice of the new date. One week before that date, he requested a postponement for "recent medical problems." A doctor examined him and reported to the court that there was no valid medical reason for the trial not to take place. He then immediately filed a Chapter 11 petition and sought removal of the original case to the bankruptcy court. The court came to the obvious conclusion that the Chapter 11 petition had been filed as a part of a general scheme to abuse the judicial process. *Furness*, 35 B.R. at 1013.

Mrs. Dovydenas also relies upon *In re Cook*, 104 F.2d 981 (7th Cir.1939), *cited*

*with approval* in *Furness v. Lilienfield*, 35 B.R. at 1012. In *Cook*, trustees of the debtor, a real estate trust, had been involved in state court litigation for over fourteen years concerning property in the trust. The latest clash involved a request by holders of mortgage bonds to remove the trustees and require them to account for alleged misconduct. The trustees filed a Chapter X petition 10 days before they were required to provide a final account and report to the state court. The court dismissed the bankruptcy petition for lack of good faith, finding that the debtor trust was not in dire financial straits and that the filing was an attempt by the trustees to escape the "day of reckoning" in the state court. *In re Cook*, 104 F.2d at 985.

The conduct of the defendants in *Furness* and *Cook* is quite different from that of the defendant here. No "day of reckoning" was at hand for the Debtor. It is not seeking to escape from a court order to account for its actions, as the trustees were in *Cook*, or making a desperate attempt to avoid a trial, as the debtor did in *Furness*. Nor is the Debtor seeking to escape, as Mrs. Dovydenas charges, an obligation to comply with discovery requests. If the Dovydenas claim is litigated in this Court, she will be able to use the same discovery devices here that were available to her in the Massachusetts courts, many under the same or similar rules. *See infra* discussion of estimation of claims; *compare* MASS.R. CIV.PRO. 26–37 *with* FED.R.CIV.PRO. 26–37 *and* BANKR.R. 7026–7037. Furthermore, the Debtor's petition was not filed for the sole purpose of escaping adverse state court orders. Other considerations were significant factors in the Debtor's decision to file, such as the cash flow problem and the threat to the Debtor's existence if Mrs. Dovydenas succeeded in proving her claim (see discussion *infra*).

Finally, no pattern exists here, as it did in *Furness* and *Cook*, of repeated attempts to delay the litigation or resolution of a state court suit. Rather than trying to avoid battle, the Debtor was the first to bring suit in the state courts. In neither that litigation nor in the suit brought by Mrs. Dovydenas was the Debtor sanctioned for delaying tactics. The Debtor did seek protective orders concerning discovery, but its counsel were motivated by a concern that information gained from discovery would be released to the news media. I find that concern to be a genuine one, whether or not the treatment afforded the Debtor in the local media constituted objective grounds for the concern.

The Debtor mounted an aggressive attack in the state courts, and it presented a strong defense following the institution of suit by Mrs. Dovydenas. The Debtor promptly filed both an answer to the Dovydenas complaint and a motion to dismiss the complaint. It did not fail or refuse to comply with discovery requests. It sought, in timely fashion, protective orders from the state court. Mrs. Dovydenas and her counsel, in the heat of battle (and in the clash of personalities that obviously has taken place here), may regard the Debtor's actions in the state court as delay and harassment. By objective standards, however, the Debtor's actions fell within the boundaries of acceptable litigation practices.

The Debtor's actions to date in this Court, rather than indicating an intent to delay resolution of the Dovydenas dispute, demonstrate a firm intention to resolve the matter as quickly as possible. The Debtor has already filed a motion requesting the Court to fix an early bar date for the filing of claims. Counsel for the Debtor have stated to the Court their intention to file a claim on behalf of Mrs. Dovydenas if she does not do so by the bar date, to be fixed by the Court, as is permitted by Bankruptcy Rule 3004.

There is no ground to conclude that the Debtor filed its Chapter 11 petition other than in the honest belief that it was entitled to the remedies of Chapter 11. Counsel for the Debtor rely upon the decision in *In re Johns-Manville Corp.*, 36 B.R. 727 (Bankr.S.D.N.Y.1984), which is discussed later in this opinion. They carefully reviewed that decision and other relevant au-

thority prior to the filing. Whether or not *Johns-Manville* applies or may be properly extended to apply here is irrelevant to this aspect of the case. After hearing the arguments of counsel and the evidence, this Court has no doubt that the Debtor and its counsel filed the Chapter 11 petition in the honest belief that *Johns-Manville* applies here.

Nor is there any reason to believe that the Debtor does not have the honest intention to complete a successful Chapter 11 reorganization. To date it has complied with all of the filing requirements imposed by this Court. It has also made timely filings of periodic reports with the United States Trustee. Obviously, its ability to consummate a successful reorganization depends to a significant extent upon a resolution of the Dovydenas claim largely in its favor. If the claim is established at or near its total amount, the Debtor will face difficulties in paying the dividend that would then be required. In that event, it is conceivable that a reorganization plan will be facilitated by the so-called "cram down" provisions contained in § 1129(b)(2). Whether or not the Debtor would be successful in these circumstances has no bearing here. I have no hesitation in finding that the Debtor has the honest intention to reorganize.

All of this is certainly not to say that the Dovydenas litigation was not the Debtor's predominant reason for its Chapter 11 filing. It clearly was. Just as the debtor in *Johns-Manville* sought to resolve a proliferation of tort claims, so too does the Debtor here seek to resolve the Dovydenas claim. We now turn to the question of whether that may be done.

### IV. Jurisdiction for This Chapter 11 Proceeding

The Debtor clearly meets the express statutory requirements for eligibility to file a voluntary petition seeking Chapter 11 reorganization. Under § 109 of the Bankruptcy Code, the only entities excluded from eligibility for Chapter 11 reorganization are railroads, stockbrokers, commodity brokers and certain insurance companies and financial institutions. 11 U.S.C. § 109(d). Neither § 109 nor § 301 governing voluntary cases contains a requirement that a debtor be insolvent in the equity or bankruptcy sense. Nor does § 109 or § 301 impose a less stringent financial standard, such as, for example, an incipient or predictable inability to pay debts as they mature.

Comparison of § 109 and § 301 with other provisions of the Bankruptcy Code demonstrates that the omission of financial standards was intentional. If an involuntary petition is contested, § 303(h) permits a court to enter an order for relief under the applicable chapter only in the following circumstances:

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts that [sic] are the subject of a bona fide dispute; or

(2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

Thus the petitioners in a contested involuntary filing must establish either that the debtor suffers from the practical equivalence of equitable insolvency or that within the prior 120 days the debtor had been placed into a state court receivership, an assignment for the benefit of creditors, or the like.

The absence of financial standards for the institution of a voluntary Chapter 11 proceeding is also in marked contrast to the requirements for the commencement of voluntary and involuntary proceedings under the prior Bankruptcy Act. Under that law, a voluntary Chapter XI petition (the sole type allowed) could be brought only if the debtor was "insolvent or unable to pay his debts as they mature." Chandler Act Amendments of 1938, ch. 575, § 323, 52 Stat. 840, 907 (June 22, 1938) (codified as 11 U.S.C. § 723) (repealed 1978). Under Chap-

ter X, the petitioner in either a voluntary or involuntary petition had to allege and be prepared to prove insolvency or inability to pay debts as they mature, *id.*, § 130, 52 Stat. at 886 (codified as 11 U.S.C. § 530) (repealed 1978), as did a Chapter XII debtor, *id.*, § 423, 52 Stat. at 918 (codified as 11 U.S.C. § 823) (repealed 1978), and a Chapter XIII debtor. *Id.*, § 623, 52 Stat. at 932 (codified as 11 U.S.C. § 1023) (repealed 1978).

Legislative history demonstrates that the decision by Congress not to impose financial standards was prompted by a desire to encourage businesses to seek reorganization at a relatively early stage in order to maximize the chances of success. The Commission on the Bankruptcy Laws of the United States was the author of the original bill which formed the basis for the present Bankruptcy Code. That bill imposed no financial requirement for the filing of a voluntary petition. The section in the bill governing dismissal (§ 7–112) was similar to § 1112 as finally enacted. The Commission had this to say in explanation:

Access to the credit economy, both to establish debts and to collect them, is not legally restricted. Access to collective relief should be similarly open except for safeguards against fraudulent use. There should be no legal barrier to voluntary petitions. An involuntary petition should be authorized upon a showing, as evidentiarily simple as fair and feasible, that the debtor has demonstrated a inability generally to pay his debts or while insolvent has acted fraudulently against the interests of his creditors.

Initiating relief should not be a death knell. The process should encourage resort to it, by debtors and creditors, that cuts short the dissipation of assets and the accumulation of debts. Belated commencement of a case may kill an opportunity for reorganization or arrangement.

*Report of the Commission on The Bankruptcy Laws of the United States*, H.R. DOC. No. 137, 93d Cong., 1st Sess., Pt. 1 at 75 (1973).

Testimony before the House of Representatives by members of the National Bankruptcy Conference also showed concern over the erosion of assets which is caused by undue delay in the commencement of a reorganization proceeding. *See Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil Constitutional Rights of the Comm. on the Judiciary of the House of Representatives*, 94th Cong., 2d Sess., 1876 (1976) (Statement of Harvey R. Miller, *et. al.*, on Behalf of the National Bankruptcy Conference on Business Reorganizations).

It is nevertheless necessary that there be at least an arguable relation between the proposed reorganization and the purposes of Chapter 11. *In re Coastal Cable T.V., Inc.*, 709 F.2d 762, 764 (1st Cir.1983). These purposes are described in the House Report as follows:

The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that assets that are used for production in the industry for which they were designed are more valuable than those same assets sold for scrap. Often, the return on assets that a business can produce is inadequate to compensate those who have invested in the business. Cash flow problems may develop, and require creditors of the business, both trade creditors and long-term lenders, to wait for payment of their claims. If the business can extend or reduce its debts, it often can be returned to a viable state. It is more economically efficient to reorganize than to liquidate, because it preserves jobs and assets.

*Report of the Committee on the Judiciary, House of Representatives, To Accompany H.R. 8200*, H.R.REP. No. 595, 95th Cong., 1st Sess. 220 (1977), U.S.Code Cong. & Admin.News 1978, p. 6179.

Thus Congress favored Chapter 11 reorganization as a means of continuation of

operations, preservation of jobs, payment of creditors and a return to stockholders. It recognized the substantial difference between going concern value and liquidation value as a source for payments to creditors.

The legislative history quoted above also indicates that Congress intended Chapter 11 to be resorted to by business entities which are experiencing some type of financial difficulty. The question, therefore, is this: Are the problems which the Debtor is now facing within the range of financial difficulties envisioned by Congress? To put it another way, in terms used by the Court of Appeals of the First Circuit in *In re Coastal Cable T.V., Inc., supra,* does the Debtor's use of the reorganization process bear some rational relation to the purposes of Chapter 11? *Coastal Cable,* 709 F.2d at 764. We believe that it does.

The Debtor is actually experiencing two types of financial difficulty: a cash flow problem which prevents it from meeting its current obligations and a claim which poses a threat to its continued existence. The Court has made no attempt to assess the merits of the Dovydenas claim. To do so would require something approaching a full-fledged trial. The Court has, however, observed Mrs. Dovydenas on the witness stand. She is an articulate and forthright witness. She is represented by counsel whose apparent qualities of competence and sincerity make it unlikely that this is a frivolous claim. The amount of the claim is staggering. Its size may well exceed the value of the Debtor's assets. Clearly the Dovydenas claim poses a threat to the Debtor's continued existence. Whether or not this threat is considered in conjunction with its present inability to pay its present bills, the Debtor is in serious financial distress.

The characteristics of the Debtor also bear a clear relation to the purposes of Chapter 11. The Debtor conducts substantial and complex operations. It has numerous employees who depend upon it for their livelihood. It has real creditors. Finally, the nature of its assets, particularly its extensive real estate used for special purposes, is such that the value of these assets would surely shrink significantly if the Debtor were forced to liquidate.

In *In re Alton Telegraph Printing Company,* 14 B.R. 238 (Bankr.S.D.Ill.1981), a state court had entered a $9.2 million dollar libel judgment against the debtor. Because of the size of the judgment in relation to its assets, the debtor was unable to post the supersedeas bond necessary for an appeal, and it filed for Chapter 11 protection. The court sustained the filing because it found that the size of the judgment threatened the debtor's existence as an ongoing concern and that Chapter 11 was necessary to protect the debtor's employees and its other creditors.

There is no reason that the Debtor in this case, even without its pressing cash flow problems, should be required to follow a similar pattern and seek reorganization under Chapter 11 only if it is unsuccessful in the Dovydenas litigation. The Debtor also has employees and other creditors who depend on its continued existence. Furthermore, the Court finds that with the Dovydenas claim hanging over its head, the Debtor is unable to make long range plans or obtain the financing that it now needs. The threat posed by the claim has already produced a significant effect. The Debtor has been unable to obtain financing, despite the fact that it has valuable real estate which is unencumbered. Information disclosed at the hearing confirms a financial truism: lenders want a borrower who has the ability to repay a loan in the ordinary course. Lenders do not make loans in anticipation of payment from foreclosure. Foreclosure would likely be the only means of repayment if Mrs. Dovydenas is at all successful in prosecuting her claim. The Debtor's current cash flow problems of course add to its difficulties in obtaining financing. Finally, if Mrs. Dovydenas prevailed in state court, satisfaction of her judgment would consume most of the Debtor's assets and probably terminate its existence.

Moreover, there is a procedure available under the Bankruptcy Code for resolution of the Dovydenas claim which makes a Chapter 11 reorganization particularly advisable now rather than after adjudication of the claim in the state courts. In seeking to resolve the Dovydenas claim before this Court, the Debtor will have available to it an expeditious bankruptcy procedure for estimation of contingent or unliquidated claims. Under § 502(c) of the Bankruptcy Code this Court is required to "estimate" for purposes of allowances "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the closing of the case." The "fixing or liquidation" of the Dovydenas claim in the state courts would unduly delay the closing of this Chapter 11 case because of the centrality of that claim to the question of the debtor's financial health. The framework of a Chapter 11 plan would have to be built around it. Moreover, the Debtor cannot move ahead with financing or any type of long range plans until the claim is resolved. No plan of organization is practical until the claim is adjudicated. Adjudication in the state courts through the usual trial procedure, followed by what would appear to be an inevitable appeal, could take years. This Court, on the other hand, has substantial discretion to fashion a procedure whereby the Dovydenas claim is quickly and simply adjudicated so that the parties can then immediately proceed to the proposal and confirmation of a plan of reorganization. *Bittner v. Borne Chemical Co.*, 691 F.2d 134 (3d Cir.1982); *Addison v. Langston (In re Brints Cotton Marketing, Inc.)*, 737 F.2d 1338, 1341 (5th Cir.1984); *In re Nova Real Estate Investment Trust*, 23 B.R. 62, 65–66 (Bankr.E.D.Va.1982); *In re Unit Parts Co.*, 9 B.R. 386 (W.D.Okla.1981).

It is not necessary, or advisable, that the Court establish the details of a claims estimation procedure at this point. The Court will hear arguments on the question when the Dovydenas claim has been filed (by either the Debtor or Mrs. Dovydenas) and an objection has been made. A few comments here, however, may be pertinent to the present issue. The Court's discretion in establishing a procedure includes the authority to estimate the claim according to its ultimate merits rather than according to the present value of the probability of success. *Bittner v. Borne Chemical Company, supra.* The Court favors the "ultimate merits" method because of its fairness and finality. Because of the importance of the Dovydenas claim to the reorganization plan, something approaching a complete trial, with limited discovery, would appear to be more appropriate than the summary type of procedure adopted in *In re Baldwin United Corp.*, 55 B.R. 885 (Bankr.S.D. Ohio 1985). Nor would it seem wise, because of the delay and uncertainty, to do either as the court did in *Bittner v. Borne Chemical Company, supra,* and make only a temporary determination, leaving final adjudication to the state courts, or to follow the similar duplicative procedure adopted in *In re Nova Real Estate Investment Trust, supra.* As part of establishing a claims estimation procedure, it will be advisable to determine the effect which an appeal from the Court's allowance or disallowance of the claim would have upon implementation of a plan of reorganization. In doing so the Court will have the authority, notwithstanding the appeal, to order immediate commencement of proceedings for the proposal and confirmation of a plan of reorganization. BANKR.R. 8005.

Other considerations militate in favor of granting the Debtor access to Chapter 11. At the same time that Congress eschewed financial requirements for voluntary entry into the Chapter 11 reorganization process, it also gave creditors significantly greater rights in that process. Involving creditors in Chapter 11 no longer amounts to bringing them into the lion's den of the debtor. Under Chapter XI of the former Bankruptcy Act, the debtor was in the driver's seat. He alone could initiate the chapter proceeding, and he alone could propose a plan for payment of creditors. Creditors had the right to accept or reject the plan, but the alternative to rejection was liquidation, frequently a form of business suicide which

gave little or no dividend and ended all hope on the part of creditors to recoup their losses through future business dealings with the debtor. Under Chapter 11 of the present Bankruptcy Code, on the other hand, creditors can initiate and maintain a Chapter 11 proceeding over the objection of a debtor, merely by establishing that the debtor is "generally not paying" its debts as they become due. 11 U.S.C. § 303(h). Once the proceeding is commenced, whether by creditors or the debtor, creditors have the right to propose their own plan after an initial period during which the debtor has exclusive plan proposal rights, which consists, generally, of the first 120 days. 11 U.S.C. § 1121(c). The Chapter 11 plan can also now affect stock interests. Therefore, if creditors are dissatisfied with the present management of the debtor or its capital resources, or both, they have the right to bring in a new owner who can supply deficiencies in management and capital. In summary, granting debtors easy access to Chapter 11 merely begins a process which is designed as much for the benefit of creditors as for debtors. There is therefore little reason under the present Bankruptcy Code to make entry into the process difficult for the Debtor.

Because of the size of the Dovydenas claim, Mrs. Dovydenas will control the creditor body if she is at all successful in establishing her claim. That control could well give her the right to propose and have confirmed a plan requiring a sale of the Debtor's assets. She would in this way have every opportunity, if she wishes, to attempt to bring about a sale of the Lenox property to an educational or religious institution. She would thereby have the opportunity to sell the property at its going concern value, or, at the very least, its fair market value.

This is considerably more than she could do if she resorted to her remedies in the state courts. Under Massachusetts law, levy upon real estate in the execution of a judgment may be accomplished in one of two ways: levy by setoff, pursuant to the appraisal of three appraisers; or levy by public sale. MASS.GEN.L. ch. 236, §§ 6–30. The debtor has a period of one year following the setoff or the sale during which he may redeem the property by payment of the appraisal value or sales price, as the case may be. MASS.GEN.L. ch. 236, § 33. This one year right of redemption places a cloud upon the title to the property which would have a tendency to further substantially reduce the amount obtainable at a public sale which, by reason of its summary procedure, already has tendencies to bring about a low price. If levy by setoff is the method chosen, the right of redemption would greatly complicate the appraisal procedures. It would also tend to reduce the value of the property for setoff purposes, which in turn would reduce the redemption price. Under either method there is a one year period of uncertainty during which the party claiming ownership, either the judgment creditor or the purchaser, must maintain and insure the property, as well as keep up the taxes, without knowing whether he will continue in ownership. In practice, consequently, levy upon real estate is not an attractive method of enforcing a judgment in Massachusetts.

For all of these reasons, the Dovydenas claim alone presents sufficient reason for a Chapter 11 reorganization. Thus, even if the Debtor were now able to meet its current obligations, it would be unwise to require a reasonable likelihood of insolvency in the bankruptcy sense in the foreseeable future. *Cf.* Note, *The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings,* 96 Harv.L. Rev. 1121, 1126–28 (1983). Moreover, requiring such a prognostication is impractical because it would initiate a premature determination of the merits of the Dovydenas claim merely for the purpose of ruling on the motion to dismiss, and then a second adjudication on the merits if the motion was denied. This would be a waste of judicial effort.

The foregoing analysis is consistent with the decision in *In re Johns-Manville Corp.,* 36 B.R. 727 (Bankr.S.D.N.Y.1984). That

case involved a Chapter 11 filing by a member of the so-called "Fortune 500" which was greeted by surprise and consternation. The debtor was apparently fully able to meet its current obligations. But it was plagued by a proliferation of law suits based upon personal injuries due to asbestos exposure, and property damage claims for unknowing use of asbestos in buildings. At the time of trial, 16,000 personal injury suits were pending. Approximately 6,000 additional such claims had arisen during the first 16 months of the Chapter 11 proceeding. Most of the insurance carriers disavowed coverage, and these coverage questions were also being litigated. The debtor created a $1.9 billion reserve for its estimated asbestos personal injury liability. The booking of this reserve gave the holders of about $450 million of debt the right to accelerate their debt, which if done could have required liquidation of portions of Manville's business. It was also estimated that its property damage liability would eventually total $500 million to $1.4 billion.

The court ruled that with this real and massive debt *Manville* was entitled to seek a Chapter 11 reorganization. The court made no attempt to fashion a precise financial standard, but rather based its jurisdiction upon the existence of this serious asbestos liability problem and the Bankruptcy Code's policy of open access. It relied upon the legislative history reviewed previously which shows Congress' desire to remove legal barriers to the filing of voluntary Chapter 11 petitions and concluded that the various congressional goals of reorganization applied to the *Manville* Chapter 11 proceeding. *Johns-Manville,* 36 B.R. at 735–37. The Court rejected any necessity for a "good faith" inquiry at any early stage of the proceeding, stating that such an inquiry is more appropriate at the time of plan proposal in accordance with the express requirements of § 1129. *Id.* at 737. The court did not view a filing made for the purpose of replacing litigation in other courts with a claims estimation procedure in the bankruptcy court as an abuse of the bankruptcy court's jurisdiction. *Id.* at 741.

The Dovydenas claim presents a comparable threat to this Debtor. There is of course a great difference in the number of claims, but this difference does not change the fact that the Dovydenas claim may also require liquidation of the Debtor.

*In re Continental Airlines Corp.,* 38 B.R. 67 (Bankr.S.D.Tex.1984), also permitted a financially distressed debtor to maintain a Chapter 11 proceeding which had been significantly motivated by the debtor's desire to receive assistance from the Bankruptcy Code in its dispute with third parties, in that case employees represented by unions. Continental had had substantial operating losses in recent years and was unable to pay its current debts, so its need for Chapter 11 by reason of its present operations was fairly obvious. The court did not find that Continental's planned rejection of its collective bargaining agreements under § 365 of the Bankruptcy Code was its primary purpose for filing. *See Continental,* 38 B.R. at 71. However, it was apparently undisputed that the planned rejection formed an essential part of the debtor's anticipated Chapter 11 reorganization.

We view *Continental* as precedent for denying the Dovydenas motion to dismiss. Equitable insolvency is present in both cases. However, unlike the court in *Continental,* we have no hesitation in finding that resolution of a third party dispute was the prime purpose for the Chapter 11 filing, and in ruling that under all of the circumstances present here this alone provides sufficient justification for the filing.

Mrs. Dovydenas relies upon several decisions involving Chapter 11 debtors who sought to have various tools available in Chapter 11 aid them in their disputes with third parties. All are quite distinguishable. The Chapter 11 filing in *In re Coastal Cable T.V., Inc.,* 709 F.2d 762 (1st Cir. 1983), was prompted by the debtor's desire to have the bankruptcy court approve a sale of a cable television license over the objection of those claiming a disputed ownership of a controlling block of the debtor's

capital stock. The debtor had essentially only one creditor, its alleged parent corporation, which was owed much less than the price of the proposed asset sale. The court was troubled by the apparent attempt to resolve a dispute over the right to sell an asset for $3,000,000 on the basis of an $85,000 debt that might not exist. The court failed to see even an arguable relationship between the Debtor's proposed reorganization and the purposes that a Chapter 11 reorganization was designed to serve, and, *sua sponte*, it sent the case to the district court in order for it to determine the appropriateness of the filing. The differences between *Coastal Cable T.V.* and this case are obvious. The Debtor here has significant financial problems, substantial real debt, many employees with jobs at stake and assets whose fair market values are in all likelihood far in excess of their liquidation values.

*In re Nancant, Inc.*, 8 B.R. 1005 (Bankr. D.Mass.1981), is distinguishable for many of the same reasons. There the debtor's principal assets were vacant buildings which had been formerly occupied by a school. Except for one nominal unsecured debt, its only indebtedness consisted of two real estate mortgages. It had no disclosed plan of reorganization, formal or informal. The reason that it filed a Chapter 11 petition was to invoke the aid of the bankruptcy court in its dispute over real estate taxes with the local town. In bankruptcy, it could contest the tax debt without first paying the tax claimed. The procedure outside of bankruptcy required the debtor to pay the tax before contesting it. The court dismissed the case under § 1112(b) because of the near absence of unsecured debt, the lack of any ongoing operations or a reorganization plan and the attempted use of the bankruptcy court to litigate tax matters in such a vacuum. It was careful to observe, however, that dismissal would not necessarily be required in all cases where the primary goal of the filing was resolution of a tax liability. *Nancant*, 8 B.R. at 1009–10. *In re Washington Funding Corporation*, 13 B.R. 216 (Bankr.E.D. N.Y.1981), was a similar case under the old

Act which prohibited use of Chapter 11 for the adjudication of real estate taxes by an entity holding just one parcel of real estate and operating no business. The debtor in *In re Century City, Inc.*, 8 B.R. 25 (Bankr. D.N.J.1980), was another defunct entity with virtually no creditors. It did not even have record title to the real estate it sought to develop. Its Chapter 11 Proceeding, which had been instituted primarily as a vehicle to recapture the real estate, was dismissed by the court because of lack of economic substance. For the reasons stated, none of these decisions has application here.

### V. Termination of Automatic Stay

Mrs. Dovydenas requests, alternatively, that the Court terminate the automatic stay pursuant to § 362(d) of the Bankruptcy Code in order to permit her to continue the state court litigation. She asserts that if the considerations previously discussed are not "cause" for dismissal under § 1112(b) they are, nevertheless, "cause" for termination of the automatic stay under § 362(d). We disagree. Virtually all of the same reasons for denying dismissal are equally valid for continuation of the automatic stay. There is no need to further prolong this opinion by repeating them. Termination of the automatic stay would clearly frustrate the principal purpose of the proposed reorganization.

### VI. Abstention

Mrs. Dovydenas also requests, alternatively, that the Court abstain from resolution of the Dovydenas claim in order to permit the state court litigation to continue. She bases this request in part upon the mandatory abstention provisions of 28 U.S.C. § 1334(c)(2), which provides in pertinent part:

Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the

United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

We fail to see how § 1334(c)(2) can have any possible application here. First, there is not yet pending in this Court any "proceeding" upon which the statute can operate. All that is pending is a Chapter 11 "case" over which this Court (by reference from the District Court under 28 U.S.C. § 157) has original and exclusive jurisdiction pursuant to 28 U.S.C. § 1334(a). There will be a "proceeding" pending here when a claim is filed by or on behalf of Mrs. Dovydenas and an objection is made thereto. But even then § 1334(c)(2) will be wide of the mark because the statute applies only to "related" proceedings, not proceedings "arising under Title 11" or "arising in a case under Title 11." Mrs. Dovydenas' claim would not be a "related proceeding." That category encompasses claims held by a debtor prior to the bankruptcy filing and civil proceedings between third parties. 1 COLLIER ON BANKRUPTCY § 3.01[3][b] (15th ed. 1986). The classic related proceeding is represented by *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which involved a pre-filing cause of action for breach of contract and other matters. The court in *Marathon* held that bankruptcy judges without lifetime tenure did not have constitutional jurisdiction over such causes of action. We do not, however, doubt our jurisdiction over Mrs. Dovydenas' claim.

■ Mrs. Dovydenas also requests that this Court abstain as a matter of discretion under the permissive abstention provisions of 28 U.S.C. § 1334(c)(1), which provides as follows:

Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

Here again, there will be no "proceeding" from which we can abstain until the Dovydenas claim is filed and objected to. Thus the question is premature. It is, however, appropriate to express the Court's views on permissive abstention because of the importance of the Dovydenas claim to this Chapter 11 case.

Our decision to retain the case and ultimately adjudicate the Dovydenas claim is not opposed to principles of comity with state courts, a factor mentioned in § 1334(c)(1). Contested claims are so-called "core proceedings" under 28 U.S.C. § 157(b)(2)(B). The significance of this designation under § 157(b)(2) is that Congress considered contested claims so much a part of the administration of a case that it gave bankruptcy judges the jurisdiction to adjudicate them despite whatever other jurisdictional questions may be raised by the *Marathon* decision. In this case, resolution of the Dovydenas claim alone will constitute an essential part of the Debtor's reorganization, as we have discussed. Added to these considerations is the fact that the state court litigation had barely commenced prior to the filing of this Chapter 11 case. Thus we see no problem of comity in our adjudicating the claim. There may be circumstances where it is proper for a bankruptcy court to abstain from hearing a core proceeding, *see* 1 COLLIER ON BANKRUPTCY § 3.01[3][a] (15th ed. 1986), but they are not present here.

Nor does our decision to adjudicate the Dovydenas claim indicate lack of respect for state law, another factor set forth in § 1334(c)(1). The Dovydenas claim is based upon causes of action for lack of donative intent, undue influence and fraud. None of these involves unsettled questions of state law. *Cf. Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940). Moreover, bankruptcy judges are constantly dealing with a myriad of state law issues, particularly with respect to contested claims. Indebtedness is invariably based upon state law. Thus

abstention is not indicated merely because the Court will be adjudicating rights created under state law. *Danning v. Lummis (In re Tom Carter Enterprises, Inc.),* 44 B.R. 605, 610 (C.D.Cal.1984).

The interest of justice, the third statutory factor, does not favor abstention. Mrs. Dovydenas complains that if forced to try her claim here she will lose her right to trial by jury. We make no ruling on her right to a jury trial on her claim in this court or the state courts. It is, however, doubtful that she has jury trial rights in the state courts. Her claim for rescission is based upon alternative counts asserting lack of donative intent, undue influence and fraud. Such a claim is traditionally equitable in nature. The Seventh Amendment preserves only trial by jury "[i]n suits at common law." U.S. CONST. amend. VII. In addition to requesting rescission in the state court, Mrs. Dovydenas also requested damages. Although the complaint does not expressly state that the request for damages is in the alternative to the rescission request, it would seem to be necessarily alternative. In seeking rescission, she asks the state court to "repay" amounts transferred to the Debtor. It is difficult to see how she could obtain anything more by way of damages. Where a legal claim is merely an alternative to an equitable claim, and where the underlying cause of action is essentially equitable in nature, there is no right to trial by jury under the Seventh Amendment. *Whitlock v. Hause,* 694 F.2d 861, 865–66 (1st Cir. 1982). The sequence of pleadings in state court supports us in our conclusion that the gravaman of the complaint is equitable, not legal. The complaint was originally for rescission only, and it was only later that it was amended to delete reference to rescission from its title and to add the damage claim. Finally, we note that a similar equity/law distinction appears to apply to the right to trial by jury under Article 15 of the Massachusetts Constitution. *See Commissioner of Banks v. Harrigan,* 291 Mass. 353, 355, 197 N.E. 92, 94 (1935) (if the subject matter of the cause of action is essentially equitable, no right to a jury trial attaches); *Parker v. Simpson,* 180 Mass. 334, 62 N.E. 401 (1902) (nature of claim controls right to jury trial). Thus, Mrs. Dovydenas' right to trial by jury appears to be no greater under the Massachusetts Constitution. *See Whitlock v. Hause,* 691 F.2d at 866–67.

Whether or not we are correct in these observations (and we do not purport to adjudicate the jury trial issue), resolution of Mrs. Dovydenas' right to trial by jury is not determinative on the present question. Mrs. Dovydenas will be afforded all due process in this Court. As we have observed, circumstances call for more than a summary hearing. The trial in a bankruptcy court of a disputed claim creates what is called a "contested matter." BANKR.R. 3007 & 9014. The court has the authority, *sua sponte,* to direct that the rules governing so-called "adversary proceedings" shall apply. BANKR.R. 9014. These rules are essentially a restatement of the Federal Rules of Civil Procedure. Because of the size and complexity of the Dovydenas claim, the Court will likely direct that at least some of the rules governing adversary proceedings will govern the hearing on objection to the claim.

## VII. Conclusion

For the foregoing reasons, Mrs. Dovydenas' motion, with all of its requested alternative relief, is denied. In view of this denial, it is not necessary to rule upon the issue of the standing of Mrs. Dovydenas as a party in interest to bring the motion.

SO ORDERED.