

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-20-2004

# In Re: Integrated

Precedential or Non-Precedential: Precedential

Docket No. 04-2411

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"In Re: Integrated " (2004). *2004 Decisions.* Paper 273.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/273

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

_____

Case No:  04-2411

_____

IN RE: INTEGRATED TELECOM
EXPRESS, INC.
a/k/a INTEGRATED TECHNOLOGY
EXPRESS, INC.
a/k/a DELAWARE INTEGRATED
TELECOM EXPRESS, INC.,

Debtor

NMSBPCSLDHB, L.P.,

Appellant

v.

INTEGRATED TELECOM EXPRESS,
INC.;
and THE OFFICIAL COMMITTEE OF
EQUITY HOLDERS, et al.

On Appeal From The United States
District Court
For The District Of Delaware
(Civ. A. No. 03-236-KAJ)

District Judge:  The Honorable Kent A.
Jordan

_____

Argued August 3, 2004

_____

Before: SMITH, BECKER, and
GREENBERG, *Circuit Judges*

(Filed: September 20, 2004)

Seth P. Waxman (Argued)
Craig Goldblatt
Wilmer Cutler Pickering
    Hale & Dorr LLP
2445 M Street, NW
Washington, DC  20037

Christopher J. Meade
Wilmer Cutler Pickering
    Hale & Dorr LLP
399 Park Ave
30th Floor
New York, NY  10022

*Counsel for Appellant*

Laura D. Jones
David W. Carickhoff, Jr.
Pachulski, Stang, Ziehl, Young,
    Jones & Weintraub P.C.
919 North Market Street
P.O. Box 8705, 16th Floor
Wilmington, DE  19801

Tobias S. Keller (Argued)
Pachulski, Stang, Ziehl, Young,
    Jones & Weintraub P.C.
Three Embarcadero Center
Suite 1020
San Francisco, CA  94111

*Counsel for Appellee Integrated Telecom
Express, Inc.*

Kevin Gross
Rosenthal, Monhait, Gross & Goddess

919 North Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899

Ali M. Mojdehi (Argued)
Baker & McKenzie
101 West Broadway
12th Floor
San Diego, CA 92101

*Counsel for Appellee Official Committee of Equity Security Holders*

Robert K. Rasmussen
Vanderbilt Law School
131 21st Ave. South
Nashville, TN 37240

G. Marcus Cole
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305-8610

David A. Skeel, Jr.
University of Pennsylvania Law School
3400 Chestnut Street
Philadelphia, PA 19104

*Amicus Curiae in Support of Appellant*

_____

OPINION
_____

SMITH, *Circuit Judge.*

This appeal tests the limits of the good faith requirement applicable to petitions filed under Chapter 11 of the Bankruptcy Code. Appellant NMSBPCSLDHB, L.P. (the "Landlord") appeals from an order of the District Court affirming the Bankruptcy Court's denial of its motion to dismiss for lack of good faith. The Landlord contends that the Debtor, Integrated Telecom Express, Inc. ("Integrated"), was never in financial distress and that the petition in this case was instead filed to frustrate the Landlord's claims and to increase the distribution of the Debtor's estate to Integrated's shareholders at the Landlord's expense. These contentions are corroborated by the record. First, according to schedules filed with the Bankruptcy Court, Integrated had $105.4 million in cash and $1.5 million in other assets at the time that it filed for bankruptcy, and yet the Landlord's proof of claim lists the present discounted value of Integrated's lease obligations at approximately $26 million. Integrated's schedules also list miscellaneous liabilities of approximately $430,000. Thus Integrated was highly solvent and cash rich at the time of the bankruptcy filing. Even if the IPO class action claim, which was capped at $25 million with Integrated's liability limited to a $5 million reserve (the balance to be paid by insurance) was listed at its full alleged value, Integrated was still solvent at the time of filing. Second, in a smoking gun resolution approved by the Board, and notwithstanding its strong financial position, Integrated authorized a letter to the Landlord threatening that if it did not enter into a settlement of the lease in the amount of at least $8 million, Integrated would file for bankruptcy so as to take advantage of § 502(b)(6), which

2

sharply limits the amount that a landlord can recover in bankruptcy for damages resulting from the termination of a lease.

The issue on appeal is whether, on the facts of this case, a Chapter 11 petition filed by a financially healthy debtor, with no intention of reorganizing or liquidating as a going concern, with no reasonable expectation that Chapter 11 proceedings will maximize the value of the debtor's estate for creditors, and solely to take advantage of a provision in the Bankruptcy Code that limits claims on long-term leases, complies with the requirements of the Bankruptcy Code. We conclude that such a petition is not filed in good faith and will therefore reverse.

I.

Integrated was a supplier of software and equipment to the broadband communications industry. In the summer of 2000, Integrated negotiated a lease of real property in Silicon Valley with the Landlord. After several months of negotiation, during which the Landlord evaluated Integrated's business condition and reviewed the company's prospectus, Integrated and the Landlord executed a lease for a term of ten years beginning on February 23, 2001, with a monthly base rent of $200,000, increasing 5 percent annually. The Landlord was aware of the financial risks associated with Integrated's business and willingly accepted those risks.

2001 was a very poor year for Integrated. The market for many of the company's products deteriorated, causing Integrated to suffer net losses of $36.2 million. Integrated hired a management and technology consulting firm in December 2001 to help evaluate Integrated's operating alternatives. Integrated also retained Lehman Brothers, an investment bank, in February 2002, to assist in identifying, soliciting, and evaluating proposals for a sale or merger of Integrated or its assets. Unable to find a third party willing to enter into such a transaction, and unable to identify an alternative business model, Integrated's Board of Directors prepared a plan for the liquidation and dissolution of the company under state law.

In November 2001, a securities class action styled *Richmon v. Integrated Telecom Express, Inc.*, No. 01-CV-10108-SAS, was filed in the Southern District of New York naming Integrated as a defendant, along with certain officers, directors, and underwriters of Integrated. The class consists of individuals who purchased Integrated stock between August 18, 2000, and December 6, 2000. The class action alleges claims in the amount of $93.24 million for various violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 in connection with Integrated's initial public offering of securities. Similar lawsuits concerning more than 300 other companies' initial public offerings have been filed and coordinated as *In re Initial Public Offering Securities Litigation*, No. 21-MC-00092-SAS (S.D.N.Y.).

On April 18, 2002, Integrated's Board approved a Plan of Complete Liquidation and Dissolution under

3

Delaware law. The two major issues to be resolved prior to dissolution were (1) the disposition of Integrated's intellectual property rights and (2) its remaining obligations under the lease. In May of 2002, the Board approved the sale of substantially all of Integrated's intellectual property and related assets to Real Com, a corporation to be formed by certain of Integrated's officers and directors. The proposed purchase price was $1.5 million plus assumption of Integrated's technical support and warranty obligations.

Thereafter, Integrated attempted to negotiate an accord and satisfaction of its lease. Integrated asserts that, "[d]uring this time, Debtor first became aware that it might use Chapter 11 to, among other things, address Landlord's claims." Appellee's Br. at 6-7. On August 13, 2002, the Board authorized a Chapter 11 filing in the event that the Landlord would not accept $8 million as an accord and satisfaction of Integrated's obligations under the lease. The minutes of the August 13 Board meeting state, in pertinent part:

> Mr. Regel [Integrated's CEO] updated the Board on his discussions with the landlord subsequent to the last board meeting. Mr. Regel noted that the landlord did not appear to believe that the Company would seriously consider making a bankruptcy filing.

> Ms. Murray [of the law firm Murray & Murray] next reviewed with the Board the draft letter to the landlord (a copy of which was previously distributed to the Board).

> Ms. Murray then reviewed with the Board the timeline . . . for a bankruptcy filing and related bankruptcy procedures.

> Various members of the Board then asked questions of Ms. Murray related to the draft letter to the landlord and the procedures for, and implications of, a possible bankruptcy filing by the Company. A discussion among the Board ensued, including a discussion of the costs and potential benefits and risks of proceeding with a bankruptcy filing.

> Following that discussion, Mr. Regel asked the Board for authority for management to negotiate a settlement with the landlord in an amount in the range of $6 to $7 million. A further discussion among the Board ensued regarding the costs associated with a bankruptcy filing and potential costs of any litigation. After additional discussion, the Board approved the following resolutions:

4

RESOLVED: That the officers of the Company are, and each of them hereby is, authorized and directed to send the landlord the letter prepared by Murray and Murray in substantially the form reviewed with the Board.

RESOLVED FURTHER: That the officers of the Company are, and each of them hereby is, authorized and directed to negotiate a settlement with the landlord up to a maximum settlement amount of $7 million.

RESOLVED FURTHER: That the Board hereby appoints . . . a special committee (the "Committee") that is hereby empowered on behalf of the Board to authorize the officers of the Company to enter into a settlement with the landlord up to a maximum settlement amount of $8 million.

RESOLVED FURTHER: That the officers of the Company shall be required to seek approval from the Board prior to entering into an [sic] settlement with the landlord in excess of $8 million.

RESOLVED FURTHER: That the officers of the Company be, and each of them hereby is, authorized and directed to instruct bankruptcy counsel to begin to prepare the necessary paperwork for a bankruptcy filing.

RESOLVED FURTHER: That if the landlord is not willing to enter into a settlement agreement with a maximum amount of $8 million, then the officers of the Company shall be, and each of them hereby is, authorized and empowered on behalf of, and in the name of, the Company to execute and verify or certify a petition under Chapter 11 of the Bankruptcy Code and to cause the same to be filed in the appropriate United States Bankruptcy Court (the "Bankruptcy Court") at such time as said authorized officer executing the same shall determine.

On August 15, 2002, Integrated's bankruptcy counsel sent the Landlord a letter stating that, if the Landlord was unwilling to settle, the Debtor was prepared to avail itself of various provisions in the Bankruptcy Code, including the cap on landlords' claims set

forth in 11 U.S.C. § 502(b)(6).[1] The

[1] 11 U.S.C. § 502(b)(6) limits the amount that a landlord can recover in bankruptcy for damages resulting from the termination of a lease. Under § 502(b)(6), a landlord can recover rent that has accrued as of the filing of the petition, but may not recover rent remaining on the lease beyond one year's rent or 15 percent of the remaining rent (not to exceed three years), whichever is greater:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects.

(b) . . . if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

. . .

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such

letter asserted that "even if [Integrated] were to file bankruptcy solely to cap the Lessor's claim using Bankruptcy Code § 502(b)(6), a use for which this Code section is intended, [Integrated] would not violate the good faith filing doctrine."

No settlement was reached.

*Proceedings in the Bankruptcy Court*

Integrated filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 8, 2002. According to schedules filed with the Bankruptcy Court, Integrated had $105.4 million in cash and $1.5 million in other assets at the time that it filed for bankruptcy. The Landlord filed a proof of claim listing the present discounted value of Integrated's lease obligations at approximately $26 million. Integrated's schedules also list miscellaneous liabilities of approximately $430,000.

Immediately after Integrated filed its petition, Integrated attempted to address

lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates . . . .

6

the two major obstacles to dissolution: the sale of its intellectual property assets and its remaining obligations under the lease. On October 9, 2002, the day after Integrated filed its petition, Integrated moved to sell its intellectual property assets at a public auction. The Official Committee of Equity Security Holders (the "OCESH") objected to the adequacy of Integrated's efforts to market the assets. Ultimately, Integrated was able to renegotiate the sale and to introduce other bidders. As a result, a new agreement was reached with Real Com for some, but not all, of the assets for $2 million, an increase of $500,000. The remaining assets were sold for $500,000 after confirmation of the plan of reorganization.

Also on October 9, 2002, Integrated moved to reject the lease. The Landlord opposed the motion and, on October 28, 2002, filed a motion to dismiss the Chapter 11 proceeding on the ground that the petition was not filed in good faith. On January 8, 2003, the Bankruptcy Court conducted an evidentiary hearing on the motion to dismiss and the motion to reject the lease during which it heard evidence regarding Integrated's decision to file for Chapter 11. After the close of evidence, the Bankruptcy Court determined that oral argument was unnecessary and denied the motion to dismiss from the bench.

The Bankruptcy Court explained at the hearing that Integrated "offered a number of reasons for the filing of the bankruptcy case," and that the court "believe[d] there is validity to a number of those considerations." The court, however, did not expand on this statement except to stress that Integrated "was losing a lot of money." The court characterized the company's financial losses as "dramatic." According to the court, Integrated "was experiencing a dramatic downward spiral" in September 2001. As such, the court concluded that "the Board had an obligation, and appropriately exercised that obligation, to give the investors their money back."

Alternatively, the Bankruptcy Court held that, "even assuming" that Integrated's stated reasons for filing the petition were not "particularly persuasive," Integrated's desire to take advantage of the § 502(b)(6) cap on landlords' claims was not a sufficient basis on which to dismiss the petition "as a matter of law":

> But even assuming that those other factors are not particularly persuasive, even assuming or accepting the landlord's position, particularly illustrated by the Board of Directors' minutes of August 13 of '02, that the principal reason for the Chapter 11 case was to cap the damage claim for the landlord, I conclude that as a matter of law, that is not a debilitating fact. I held in [*In re PPI Enterprises (U.S.), Inc.*, 228 B.R. 339 (Bankr. D. Del. 1998), *aff'd*, 324 F.3d 197 (3d Cir. 2003)], and other cases have held, that it does not

establish bad faith for a debtor to file a chapter 11 case for the purpose of taking advantage of provisions which alter pre-petition rights, including altering the rights of a landlord under State law.

The Bankruptcy Court was guided by the following proposition: "[A]s the case law clearly indicates, not limited to my case [referring to the Bankruptcy Judge's decision in *PPI*], the solvency of the debtor and the fact that the equity interest holders will receive a distribution does not serve as the basis for a finding of bad faith." The court thus saw no significance in the fact that the § 502(b)(6) cap would operate solely to the benefit of equity holders, as opposed to creditors:

> What I think is also significant in this case is that . . . this debtor had no significant debt. . . .

> The difference in this case is that the company was not at all leveraged. And if the distribution were, for the most part, or totally to go to the creditors, there would be no basis for the landlord to complain regarding some equitable principle.

> But I don't think the Code makes any distinction. And I think that the—why this case is different is because the debtor simply

was not leveraged. And instead of the significant distribution going to debt holders . . . it's going to go to the shareholders.

The Bankruptcy Court then went on to discuss "other decisions that agree with that proposition, namely that a solvent debtor can avail itself of the 502(b)(6) cap," focusing in particular on *In re Sylmar Plaza, L.P.*, 314 F.3d 1070 (9th Cir. 2002), and characterizing *Sylmar* as "almost on all fours with the situation before me."

With respect to the equities of the case, the Bankruptcy Court found that, although the shareholders would realize a "benefit" from the bankruptcy in the form of a "significant distribution," "the shareholders are not coming out whole by any means." The court concluded that "obviously you can't consider that they [*i.e.*, the shareholders] are being treated [to] any windfall." Conversely, the court found that the Landlord elected to "ride with the bulls," when it entered into the lease with Integrated, and that, as a "sophisticated individual" who "took the risk [hoping] that his instincts were right," he must "suffer the consequences" of his instincts being wrong. On January 30, 2003, the Bankruptcy Court issued an order formally denying the motion "for the reasons stated on the record at the Hearing."

*The Bankruptcy Court Confirms Integrated's Plan of Liquidation*

The Bankruptcy Court held a

8

confirmation hearing on April 7, 2003, and issued an order confirming Integrated's proposed plan of liquidation over the Landlord's objections on April 16, 2003. Applying § 502(b)(6), the Landlord's claim was reduced from $26 million to $4.3 million.

The plan of liquidation did not completely resolve the securities class action. Instead, the plan reserved $5 million of the debtor's estate to satisfy any judgment that might be entered in the securities class action. When added to $20 million in insurance coverage available to Integrated, the plan effectively limited any potential judgment in the securities class action to $25 million. The securities class voted in favor of the plan of liquidation.

The Landlord appealed to the District Court and moved the Bankruptcy Court to stay confirmation of the plan pending appeal. The Bankruptcy Court addressed the Landlord's motion for a stay at an April 29, 2003 hearing. The Bankruptcy Court reaffirmed its earlier ruling on the Landlord's motion to dismiss, making several "observations to amplify the record on the issue." Specifically, the Bankruptcy Court elaborated on the significance of the securities class action:

> There is nothing in the law to suggest that the corporation cannot avail itself to the distribution scheme set forth in the Bankruptcy Code in effecting that liquidation. In

that regard, it's also worth noting that [this] Chapter 11 case had the effect on the securities law plaintiffs similar to its effect on this landlord. It effectively reduced the recovery by the securities law claimants by treating them like shareholders pursuant to Section 510(b).[2]

Could the securities law plaintiffs obtain a bad faith ruling in this case? I don't think so for essentially the same reasons I think that the landlord cannot.

With respect to the securities law action, I am puzzled to understand how that claim could be resolved in a non-bankruptcy law liquidation context absent a final resolution of that claim. In a non-bankruptcy law context, the securities law plaintiffs would have

---

[2] 11 U.S.C. § 510(b) subordinates claims for damages arising from the purchase or sale of a security of the debtor to all claims and interests that are senior or equal to the claim or interest represented by such security. Where, as here, the security is common stock, the claim has the same priority as common stock. *Collier on Bankruptcy* §§ 510.01, 510.04[1] (15th ed. 2004).

had a very strategic advantage, namely so long as there was a possible recovery against the corporation, the liquidation would be stalled indefinitely.

The Bankruptcy Court also commented on Integrated's financial affairs leading up to its decision to file for Chapter 11:

> THE COURT: Are you saying that Integrated Telecom is a healthy company?
>
> MR. HAZELTINE: Your Honor, Integrated Telecom as it sits here today is a very healthy company. At the time it entered for bankruptcy it was a very healthy company. They had—
>
> THE COURT: They're out of business, aren't they?
>
> MR. HAZELTINE: They're out of business. But their balance sheet looks great. They have $105 million in assets, $28 million in debts if the landlord's claim is not capped.
>
> They could become an investment company, invest that money and make—make money. They just—

> THE COURT: Well, I—they could. But I believe they would be in breach of their fiduciary duty if they did, and I made this observation back in January.

The Bankruptcy Court nevertheless stayed its confirmation order pending appeal, on the condition that the Landlord post a $2.5 million bond.

*Appeal to the District Court*

The District Court affirmed, holding that the Bankruptcy Court did not abuse its discretion in denying the Landlord's motion to dismiss. The District Court concluded that the Bankruptcy Court made two specific findings of fact: (1) that in September 2001 the Debtor was in "financial distress"; and (2) that the Board, consistent with its fiduciary responsibility, properly pursued liquidation in order to fulfill its obligations to its investors. The District Court did not disturb either finding.

The District Court understood the Bankruptcy Court to have alternatively ruled, as a matter of law, that "even if the Debtor's principal reason for filing its Chapter 11 case was to cap the Landlord's damage claim, that alone was insufficient to establish bad faith." The District Court concluded that the Bankruptcy Court's legal ruling "was based on a sound interpretation of relevant case law from this and other jurisdictions, and does not constitute an abuse of discretion." The District Court rejected the Landlord's argument that "permitting a solvent

10

corporation to invoke the landlord cap would permit an end run around a core principle of bankruptcy law, the 'absolute priority rule'—that is, that creditors must be paid in full before stockholders can retain equity interests for any purpose." Like the Bankruptcy Court, the District Court observed that insolvency is not a prerequisite to filing under Chapter 11. Regardless, in light of the Bankruptcy Court's finding that Integrated was "experiencing a dramatic downward spiral" and that filing a Chapter 11 petition fulfilled the Board's obligations to shareholders, the District Court concluded that no such "end run" had taken place. Although the District Court affirmed the Bankruptcy Court's ruling, the District Court extended the Bankruptcy Court's stay of the confirmation order.

The Landlord filed a timely appeal from the District Court's order. We expedited the appeal and stayed the Bankruptcy Court's confirmation order pending the appeal. Jurisdiction in the District Court was proper under 28 U.S.C. § 158(a), and we exercise jurisdiction under 28 U.S.C. § 158(d). Although this Court's jurisdiction is over the decision of the District Court, 28 U.S.C. § 158(d), "review of the District Court's decision effectively amounts to review of the bankruptcy court's opinion in the first instance." *In re Hechinger Inv. Co. of Del.*, 298 F.3d 219, 224 (3d Cir. 2002).

II.

Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. §

1112(b) unless filed in good faith, and the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith. *In re SGL Carbon Corp.*, 200 F.3d 154, 159-62 (3d Cir. 1999); *accord Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 211 (3d Cir. 2001) ("The debtor bears the burden of establishing good faith.").[3] Whether the good faith requirement has been satisfied is a "fact intensive inquiry" in which the court must examine "the totality of facts and circumstances" and determine where a "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *Id.* at 162. We therefore review for abuse of discretion the Bankruptcy Court's refusal to dismiss a Chapter 11 petition for want of good faith. *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 211 (3d Cir. 2003). "[A]n abuse of discretion exists where the district court's decision

---

[3] Under 11 U.S.C. § 1112(b), "the court may convert a case under [Chapter 11] to a case under Chapter 7 . . . or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause." The statute lists 10 non-exhaustive factors that may amount to cause. H.R. Rep. No. 95-595, at 406 (1977), *reprinted in* 1978 U.S.S.C.A.N. 5963, 6362 ("[The] list [contained in § 1112(b) ] is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.").

rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *SGL Carbon*, 200 F.3d at 159 (quoting *ACLU v. Black Horse Pike Reg'l Bd. of Ed.*, 84 F.3d 1471, 1476 (3d Cir. 1996)).

At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy:

> "[A good faith standard] furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy. Requirement [sic] of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way . . . ."

*SGL Carbon*, 200 F.3d at 161-62 (quoting *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986)); *see also Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989) (good faith requirement is "indispensable to proper accomplishment of the basic purposes of Chapter 11 protection"). The Supreme Court has identified two of the basic purposes of Chapter 11 as (1) "preserving going concerns" and (2) "maximizing property available to satisfy creditors." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999); *accord Toibb v. Radloff*, 501 U.S. 157, 163-64 (1991) (discussing "the congressional purpose of deriving as much value as possible from the debtor's estate"). Each of these purposes informs our application of the good faith requirement:

> "Review and analysis of [the bankruptcy laws and relevant cases] disclose a common theme and objective [underlying the reorganization provisions]: avoidance of the consequences of economic dismemberment and liquidation, and the preservation of ongoing values in a manner which does equity and is fair to rights and interests of the parties affected. But the perimeters of this potential mark the borderline between fulfillment and perversion; between accomplishing the objectives of rehabilitation and reorganization, and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this

statutory policy. That borderline is patrolled by courts of equity, armed with the doctrine of 'good faith' . . . ."

*SGL Carbon*, 200 F.3d at 161 (quoting *In re Victory Constr. Co., Inc.*, 9 B.R. 549, 558 (Bankr. C.D. Cal. 1981), *order stayed Hadley v. Victory Constr. Co., Inc. (In re Victory Constr. Co., Inc.)*, 9 B.R. 570 (Bankr. C.D. Cal. 1981)); *see also Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994) ("The test is whether a debtor is attempting to unreasonably deter or harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis."); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 373 (5th Cir. 1987) (en banc) (stating that if Chapter 11 plan does not have a rehabilitative purpose, the "statutory provisions designed to accomplish the reorganization objective become destructive of the legitimate rights and interests of creditors, the intended beneficiaries"); *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*, 709 F.2d 762, 764 (1st Cir. 1991) (Breyer, J.) (stating that there must be "some relation—at least an arguable relation—between the chapter 11 plan and the reorganization-related purposes that the chapter was designed to serve").

Our cases have accordingly focused on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage. *SGL Carbon*, 200 F.3d at 165.

It is easy to see why courts have required Chapter 11 petitioners to act within the scope of the bankruptcy laws to further a valid reorganizational purpose. Chapter 11 vests petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors. When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code.

*Id.* at 165-66.[4] Likewise, "because filing a

_____

[4] In *SGL Carbon*, we used the phrase "a valid reorganizational purpose" because that case involved a plan of reorganization. *See SGL Carbon*, 200 F.3d at 167. Reorganization, however, is not the only "appropriate use of Chapter 11 since the Code clearly contemplates

13

Chapter 11 petition merely to obtain liquidating plans under 11 U.S.C. § 1123(b)(4), whereby a debtor may develop a Chapter 11 plan to sell off all of its assets." *PPI*, 324 F.3d at 211; *accord* 11 U.S.C. § 1123(b)(4) ("[A] plan may . . . provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests . . . ."). Yet liquidation plans, no less than reorganization plans, must serve a valid bankruptcy purpose. That is, they must either preserve some going concern value, *e.g.*, by liquidating a company as a whole or in such a way as to preserve some of the company's goodwill, or by maximizing the value of the debtor's estate.

We therefore reject the OCESH's argument that the good faith inquiry applies with less force to liquidation plans because, since ownership is not allowed to retain an interest in the reorganized entity, the potential for bad faith is reduced. The good faith requirement is necessitated as much by the hardship of Chapter 11 to certain interests as it is by the benefit to others. *SGL Carbon*, 200 F.3d at 161-62, 165-66. Moreover, the facts of this case demonstrate the fallacy of the OCESH's argument. While the owners of Integrated may never recover the full value of their investments, they stand to reap a substantial gain through bankruptcy, at the expense of the company's sole creditor.

tactical litigation advantages is not within 'the legitimate scope of the bankruptcy laws,' courts have typically dismissed Chapter 11 petitions under these circumstances as well." *Id.* at 165 (quoting *In re Marsch*, 36 F.3d at 828); *see also Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation.").

A.

As the Bankruptcy Court recognized, Integrated is unquestionably "out of business," and therefore has no going concern value to preserve in Chapter 11 through reorganization or liquidation under the Bankruptcy Code. The question therefore becomes whether Integrated's petition might reasonably have "maximiz[ed] the value of the bankruptcy estate." *Toibb*, 501 U.S. at 163; *accord 203 N. LaSalle*, 526 U.S. at 453. For the reasons that follow, we conclude that it would not.

To say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy. Elizabeth Warren, *Bankruptcy Policymaking In an Imperfect World*, 92 Mich. L. Rev. 336, 350 (1993) ("Two empirically based economic assumptions underlie the attempt to preserve the value of a failing company: (1) orderly liquidation is likely to produce more value—or to avoid more loss—than

14

piecemeal liquidation; and (2) going-concern value is likely to be higher than liquidation value."); Collier on Bankruptcy ¶ 1108.12 ("[W]here liquidation is appropriate, the Code contemplates orderly liquidation and not a 'fire sale.'"). At its most basic level, the Bankruptcy Code maximizes value by alleviating the problem of financial distress. *See* Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 10 (1986) ("The basic problem that bankruptcy law is designed to handle, both as a normative matter and as a positive matter, is that the system of individual creditor remedies may be bad for the creditors *as a group* when there are not enough assets to go around."). As Integrated conceded at oral argument, good faith necessarily requires some degree of financial distress on the part of a debtor. *See SGL Carbon*, 200 F.3d at 166 ("Courts, therefore, have consistently dismissed Chapter 11 petitions filed by *financially healthy* companies with no need to reorganize under the protection of Chapter 11." (emphasis added)); *Coastal Cable*, 709 F.2d at 765 ("To meet the 'good faith' requirement . . . many courts have held that a reorganization plan must bear some relation to the statutory objective of resuscitating a *financially troubled* corporation." (emphasis added)); *Baker v. Latham Sparrowbrush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 228 (2d Cir. 1991) ("Although a debtor need not be *in extremis* in order to file such a petition, it must, at least, face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future."); *In re Dixie Broad.,*

*Inc.*, 871 F.2d 1023, 1027 (11th Cir. 1989) (recognizing that one factor relevant to good faith is "whether the debtor is 'financially distressed'" and affirming dismissal of petition for, *inter alia*, use of bankruptcy proceedings despite the apparent good financial health of the debtor"); *Little Creek*, 779 F.2d at 1072 ("Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."); *In re The Bible Speaks*, 65 B.R. 415, 424-26 (Bankr. D. Mass. 1986) (concluding that, despite the absence of a statutory financial eligibility standard in Chapter 11, "[t]he legislative history [to the Bankruptcy Code] indicates that Congress intended Chapter 11 to be resorted to by business entities which are experiencing some type of financial difficulty"); *In re Talladega Steaks, Inc.*, 50 B.R. 42, 44 (Bankr. N.D. Ala. 1985) (dismissing petition where debtor "presented no evidence that financial difficulties had precipitated the filing of the petition and indeed testified that the debtor's debts and other financial obligations were substantially current").

To be sure, a debtor need not be insolvent before filing for bankruptcy protection. *SGL Carbon*, 200 F.3d at 163-64.

> [T]he drafters of the B a n k r u p t c y C o d e understood the need for early access to bankruptcy relief to allow a debtor to

15

rehabilitate its business before it is faced with a hopeless situation. Such encouragement, however, does not open the door to premature filing, nor does it allow for the filing of a bankruptcy petition that lacks a valid reorganizational purpose.

*SGL Carbon*, 200 F.3d at 163 (footnote omitted); *see also, e.g., In re Johns-Manville Corp.*, 36 B.R. 727, 736 (Bankr. S.D.N.Y. 1984) ("Accordingly, the drafters of the Code envisioned that a financially beleaguered debtor with real debt and real creditors should not be required to wait until the economic situation is beyond repair in order to file a reorganization petition."). Saying that there is no insolvency requirement, however, does not mean that all solvent firms should have unfettered access to Chapter 11. Despite the absence of an express financial eligibility requirement in the Code,[5] *SGL Carbon* emphatically rejected any such proposition:

> Courts, therefore, have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to

reorganize under the protection of Chapter 11. Those courts have recognized that if a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed.

*SGL Carbon*, 200 F.3d at 166 (citations omitted). Accordingly, the absence of a solvency requirement recognizes that even solvent firms can, at times, suffer from financial distress. *Id.* at 163 (early access for solvent debtors designed to preempt "a hopeless situation"); *In re Marshall*, 300 B.R. 507, 512-13 (Bankr. C.D. Cal. 2003) ("It is not uncommon for debtors to be solvent under the balance sheet test, and yet to have severe financial problems. . . . The United States bankruptcy law is designed to provide relief from creditor pressures for debtors with cash flow difficulties, even where they are clearly solvent under a balance sheet test.").

Both the Bankruptcy Court and the District Court concluded that Integrated faced financial distress because it "was losing a lot of money," and "was experiencing a dramatic downward spiral" in September 2001, and that, as a result, Integrated had gone "out of business." We do not see how bankruptcy offers Integrated any relief from this sort of distress, which has no relation to any debt owed by Integrated. That is, we can identify no value for Integrated's assets that was threatened outside of bankruptcy

---

[5] Integrated unquestionably meets the express statutory requirements for eligibility to file a Chapter 11 petition. 11 U.S.C. § 109(d); *The Bible Speaks*, 65 B.R. 415 at 424-25.

by the collapse of Integrated's business model, but that could be preserved or maximized in an orderly liquidation under Chapter 11. Because Integrated's "dramatic downward spiral" does not establish that Integrated was suffering from financial distress, it does not, standing alone, establish that Integrated's petition was filed in good faith.

Creditors that fear an impending default may seek to protect their claims, triggering "the chaotic mix of self-help repossession and judicial execution available at state law" to which the Bankruptcy Code provides an alternative. Warren, *Bankruptcy Policymaking*, 92 Mich. L. Rev. at 350. The absence of an insolvency requirement encourages companies to file for Chapter 11 before they face a financially hopeless situation. *SGL Carbon*, 200 F.3d at 163-64. Yet this is decidedly not the case here. The Bankruptcy Court recognized the unquestionable reality that "the debtor simply was not leveraged" and, apart from the Landlord's claim, "had no significant debt." JA34-35. The court's conclusion that "I don't think the Code makes any distinction" is legal error.

The absence of any financial distress facing Integrated distinguishes the two principal cases relied on by the Bankruptcy Court and the District Court. In *PPI*, an insolvent debtor defaulted on a lease with approximately $5.86 million in rent remaining on the lease. 324 F.3d at 200-01. The debtor's Chapter 11 petition purported to serve two main purposes: (1) liquidating the debtor's sole asset, namely,

$12.6 million in stock in Del Monte Food Co., free of restrictions that would otherwise have limited its value to $1.6 million; and (2) limiting the landlord's lease termination damages under § 502(b)(6). *Id.* at 201 & n.5. The debtor was successful on both fronts. The Del Monte stock was sold at a court-approved auction for $11 million, *id.* at 201 n.5, and the landlord's lease claim was capped at $100,000, *id.* at 207.

Critically, the debtor in *PPI* claimed to have been insolvent. In addition to the landlord's claims, the debtor had unsecured claims of approximately $54.6 million, dwarfing the value of its only asset, the Del Monte stock. *PPI*, 228 B.R. at 343. The landlord in *PPI* objected to these claims because the debt was owed to insiders of the debtor, namely, the debtor's parent companies. The landlord argued that these insider claims should be recharacterized as equity interests, which would leave the debtor solvent by approximately $11 million (not including the landlord's claim). *Id.* at 345. This issue, however, was not raised on appeal, and we proceeded on the assumption that the debtor "owed 50 million in 'inter-company debt.'" *PPI*, 324 F.3d at 200 n.3. Accordingly, *PPI* stands for the proposition that an insolvent debtor can file under Chapter 11 in order to maximize the value of its sole asset to satisfy its creditors, while at the same time availing itself of the landlord cap under § 502(b)(6).

We likewise understand *In re Sylmar Plaza*, which the Bankruptcy

Court considered "almost on all fours with the situation before me," to be a case in which Chapter 11 was used to maximize value for creditors. The debtors in *Sylmar Plaza* owned a shopping center that was subject to a secure loan from the bank. The debtors experienced "cash flow problems" and ultimately defaulted on the loan. 314 F.3d at 1072-73. Bankruptcy allowed the debtor to sell the shopping center free and clear of the bank's lien, which sale the Bankruptcy Court found to be in the best interest of the estate and all of its creditors. *Id.* at 1073; Supp. App. at 114 (Order Authorizing Sale of Real Property Free and Clear of Liens at 4, *In re Sylmar Plaza*, No. LA-99-33188-AA (Bankr. C.D. Cal. Nov. 24, 1999)).

The bank did not appeal the sale order. *Sylmar Plaza*, 314 F.3d at 1073. Instead, the Bank appealed from the confirmation of the debtor's plan of reorganization, which took advantage of a provision in the Bankruptcy Code to calculate the bank's claim according to the regular interest rate, rather than the default interest rate. *Id.* In particular, the bank objected to the fact that "the plan leaves the [debtors] solvent while permitting them to avoid paying post-petition interest at the default interest rate." *Id.* at 1074.

The Ninth Circuit affirmed the lower court's finding of good faith, reasoning that (1) insolvency is not a prerequisite to a finding of good faith, and (2) the fact that a creditor's contractual rights are adversely affected does not by itself warrant a bad faith finding. *Id.* at 1074-75. The court's holding, however,

cannot be divorced from the facts of that case, which reveal that the Bankruptcy Code was used to maximize value for creditors as a whole. Moreover, although the debtors appear to have come out solvent in *Symlar Plaza*, there is no indication that they would have come out solvent had the bank's claim not been limited, or that solvency was a foregone conclusion when the petition was filed.

In contrast, as noted above and detailed below, according to schedules filed with the Bankruptcy Court, Integrated had $105.4 million in cash and $1.5 million in other assets at the time that it filed for bankruptcy, and yet the Landlord's proof of claim lists the present discounted value of Integrated's lease obligations at approximately $26 million. Integrated's schedules also list miscellaneous liabilities of approximately $430,000. Thus Integrated was highly solvent and cash rich at the time of the bankruptcy filing. Even if the IPO class action claim, which was capped at $25 million with Integrated's liability limited to a $5 million reserve (the balance to be paid by insurance) was listed at its full alleged value, Integrated was still solvent at the time of filing.

In light of the foregoing, we conclude that the collapse of Integrated's business model does not support a finding of good faith. Integrated was not suffering financial distress when it filed its petition, and the rulings of the Bankruptcy Court and the District Court to the contrary constitute legal error. The failure of Integrated's business did not subject the

company to any pressure on the value of its assets that could be reduced or avoided in an orderly liquidation under Chapter 11. Because Integrated's economic difficulties do not establish that Integrated was suffering from financial distress, they do not, standing alone, establish that Integrated's petition was filed in good faith.

B.

On appeal, Integrated argues that its petition served a valid bankruptcy purpose because bankruptcy "provide[d] a framework for the Debtor to resolve the Securities Class Action." Appellee's Br. at 8. In this regard, the Bankruptcy Court made no findings that are entitled to deference. Instead the Bankruptcy Court merely acknowledged that Integrated "offered a number of reasons for the filing of the bankruptcy case," and that the court "believe[d] there is *validity to a number* of those considerations." (Emphasis added). "[A] number of those considerations" necessarily is less than *all* of those considerations, and the Bankruptcy Court did not identify which particular considerations had merit except to stress that Integrated "was losing a lot of money." Moreover, colloquially at least, stating that "there is validity to" something is not the same as saying that something is valid.

Nevertheless, Integrated bore the burden of demonstrating good faith, and there is no evidence in the record from which a finding of good faith could be made based on the pending securities class action. There is no question, for example,

that the securities class action did not place Integrated in financial distress. When it filed its petition, Integrated had assets of nearly $107 million (of which $105 million was cash). Integrated also had Directors and Officers ("D&O") insurance coverage of $20 million. Although the securities class claimed $93 million, Integrated concedes in its brief that it "believed that the Securities Claim would be settled, likely within policy limits [*i.e.*, for less than $20 million]." Appellee's Br. at 33. In documents filed with the SEC, including a proxy statement issued in anticipation of a vote on Integrated's Plan of Complete Liquidation and Dissolution under Delaware law, Integrated stated:

> The company believes that the claims against it are without merit and intends to defend this lawsuit vigorously. While the outcome of these claims is currently not determinable, the Company does not expect that the ultimate costs to resolve these claims will have a material adverse effect on the Company's financial position, results of operations or cash flows.

James G. Regel, Integrated's CEO, testified that the above statement was true when the proxy statement was filed. Integrated offers no argument that circumstances surrounding the securities class action changed between April of 2002, when the Board resolved to liquidate under state law, and October of that year,

when the Board decided to file under Chapter 11.

In the end, Integrated's predictions proved accurate. The securities class ultimately voted in favor of a plan of liquidation that capped their claims at $25 million. Although the plan does not resolve the securities claims, it limits Integrated's liability for the securities class action to a $5 million reserve. The securities class action will go forward, but the class has essentially capped its recovery at $25 million (the $5 million reserve plus the $20 million D&O policy). The inescapable conclusion from the record is that the securities class action did not threaten any value of Integrated that Chapter 11 seeks to preserve. This case is therefore entirely distinguishable from cases such as *Johns-Manville*, where the debtor faced "approximately 16,000 lawsuits pending as of the filing date," with the prospect of the "filing of an even more staggering number of suits over the course of 20-30 years," 36 B.R. at 729, or *The Bible Speaks*, where the debtor experienced "two types of financial difficulty: a cash flow problem which prevent[ed] it from meeting its current obligations" and a "staggering" claim that "may well exceed the value of the Debtor's assets" and that "pose[d] a threat to the Debtor's continued existence," 65 B.R. at 426. *See SGL Carbon*, 200 F.3d at 168-69 (discussing these cases).[6]

At the April 29 hearing, the Bankruptcy Court suggested that the bankruptcy process facilitated the liquidation of the securities class action. First, the Court reasoned that Chapter 11 "effectively reduced the recovery by the securities law claimants by treating them like shareholders pursuant to Section 510(b)." We cannot find any evidence in the record to support a finding that this treatment forced the securities class to accept the $25 million limit that the plan places on their potential recovery. Nor could counsel for Integrated and the OCESH support this finding when it was raised at oral argument.

Second, the Bankruptcy Court observed that, "[i]n a non-bankruptcy law context, the securities law plaintiffs would have had a very strategic advantage, namely so long as there was a possible recovery against the corporation, the liquidation would be stalled indefinitely." While the causal connection here may be more compelling, we fail to see how this observation distinguishes the securities class from any other typical creditor, since creditors often have strategic advantages outside of bankruptcy that they lack inside bankruptcy.

Regardless, neither of the Bankruptcy Court's observations establishes that Integrated suffered

---

[6] We further note that, given the $105 million in cash held by Integrated and the $20 million in D&O coverage, Integrated

would have remained solvent even if the securities class and the Landlord were to recover the full value of their claims ($93 million and $26 million, respectively).

financial distress, and neither supports a finding that liquidation under Chapter 11 offered a reasonable chance of maximizing the value available to satisfy all of the parties with an interest in Integrated's estate. Rather than pursuing a valid bankruptcy purpose, these observations suggest that Integrated filed for Chapter 11 in part to gain a litigation advantage over the securities class, a use of Chapter 11 that we emphatically rejected in *SGL Carbon*. 200 F.3d at 167 (holding that petition was not filed in good faith where debtor's sole purpose was "to put pressure on [a claimant] to accept the company's settlement terms").

## C.

Integrated argues that its petition served three additional purposes that support a finding of good faith. As with the securities class action, the Bankruptcy Court did not specify which, if any, of these asserted justifications had merit. Our own review of the record convinces us that none of Integrated's proffered justifications warrant a finding of good faith.

First, Integrated argues that Chapter 11 "provide[d] an efficient procedure for the dissolution of Debtor and distribution of its assets to parties in interest." Appellee's Br. at 8. In the same vein, the OCESH argues that "[t]he Debtor's Chapter 11 filing was in good faith [because] the debtor utilized the liquidation provisions under Chapter 11 of the Bankruptcy Code for the proper purpose of obtaining a quick, efficient, and orderly winding down of the operations of its failed business." OCESH Br. at 7. Dissolution, however, is not an objective that can be attained in bankruptcy. Collier on Bankruptcy § 727.01[3] ("After liquidation, any dissolution of the corporation or partnership that the parties desire must be effectuated under state law, since the Code does not provide for dissolution of corporations or partnerships."). Nor is "distribution," standing alone, a valid bankruptcy purpose. Instead, the Bankruptcy Code allows for a distribution of the debtor's estate pursuant to a valid plan of reorganization or liquidation. 11 U.S.C. § 1123. Antecedent to any such distribution is an inquiry whether the petition and the plan are filed in good faith, *i.e.*, whether they serve a valid bankruptcy purpose. Neither Integrated nor the OCESH offer any authority that the Code can be used to effectuate a liquidation that has no hope of maximizing the value of the company, *203 N. LaSalle*, 526 U.S. at 453; *Toibb*, 501 U.S. at 163, but simply facilitates dissolution on terms favorable to equity interests. Moreover, neither Integrated nor the OCESH have identified any efficiencies that were realized in this bankruptcy that could not have been realized under Delaware law.

Second, Integrated argues that Chapter 11 "provide[d] court oversight to the proposed sale of its intellectual property [as well as] certain protections to the parties [to the sale] not available outside of Chapter 11." Appellee's Br. at 8. Integrated's intellectual property assets consist of patents, trademarks, copyrights,

and trade secrets related to the company's products and services. There is no dispute that the sale of these assets during the bankruptcy realized an additional $1 million beyond the sale that Integrated had negotiated prior to filing its Chapter 11 petition. Under the circumstances of this case, however, this fact hardly justifies invocation of Chapter 11.

For one, the increase in value was a result of Integrated's failure to adequately market the assets to potential bidders outside of the Board and management.[7] When, on the very next day after it filed its petition, Integrated moved to sell the assets at auction without further marketing, the OCESH challenged Integrated's sale as an improper exercise of business judgment. True, the OCESH is "a creature of the Bankruptcy Code," Appellee's Br. at 31,

---

[7] Although Integrated suggests that the increase in value was realized because "the Bankruptcy Code afforded Debtor and the buyer protections including the ability to sell free and clear of liens and claims, *see* section 363(f), and specific evidentiary 'good faith purchaser' findings, *see* section 363(m)," Appellee's Br. at 30, the record provides no support for this assertion. For the most part, the assets were sold to the same insiders with whom Integrated had already negotiated a sale prior to filing for Bankruptcy. The fact that these insiders were willing to purchase the assets outside of bankruptcy undercuts any argument that the protections of the Code affected the purchase price.

and, but for Integrated's petition, the OCESH would not have existed. But surely Integrated did not need Chapter 11 to discover that a more open and competitive auction might increase the price obtained for its assets.

Moreover, the increase in value was relatively insignificant, representing less than one percent of Integrated's total assets. Integrated's *de minimis* assets (office equipment, inventory, etc.), by comparison, totaled $500,000. Further, the net gain to Integrated's estate must also consider the fees paid from the estate to the OCESH's committee members, attorneys, and professionals. In the end, this case is a far cry from *PPI*, where an *insolvent* debtor used Chapter 11 to increase the value of its sole asset by over 600 percent ($1.6 million to $11 million). That bankruptcy allowed for an additional $10 million to be paid to the creditors of the debtors. *PPI*, 324 F.3d at 201 & n.5.

Finally, Integrated argues that Chapter 11 "enable[d] the Debtor to establish a bar date and define the universe of claims against it to assure that any distributions to its creditors and stockholders account for any inchoate claims." Appellee's Br. at 8. Essentially, Integrated argues that, through the OCESH, shareholders were able to investigate potential claims and determine that none existed. The Bankruptcy Court made no finding that Integrated was subject to "inchoate" claims that needed to be liquidated or barred, and Integrated's vague and passing references to potential disputes with its shareholders is entirely

insufficient to establish a good faith expectation that Chapter 11 protection was necessary to protect Integrated from such claims.

## D.

Having determined that Integrated was not in financial distress, and having rejected Integrated's post hoc rationalizations for filing under Chapter 11, we turn to the OCESH's argument that Integrated's desire to take advantage of the cap on landlord claims provided by § 502(b)(6) establishes good faith in and of itself. Integrated makes a similar argument when it states that its petition properly sought "a favorable forum for the consideration and resolution of other disputed claims, including the Landlord's claim." Appellee's Br. at 8.

The Bankruptcy Court did not hold that Integrated's desire to take advantage of the § 502(b)(6) cap established *good* faith. Instead, the Bankruptcy Court held that "it does not establish *bad* faith for a debtor to file a chapter [11] case for the purpose of taking advantage of provisions which alter pre-petition rights, including altering the rights of a landlord under State law." (Emphasis added). We agree. Indeed, we believe it to be a truism that it is not bad faith to seek to avail oneself of a particular protection in the Bankruptcy Code—Congress enacted such protections with the expectation that they would be used. *In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992) ("It is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?").

The far more relevant question is whether a desire to take advantage of a particular provision in the Bankruptcy Code, standing alone, establishes *good* faith.[8] We hold that it does not. Just as a desire to take advantage of the protections of the Code cannot establish *bad* faith as a matter of law, that desire cannot establish *good* faith as a matter of law. Given the truism that every bankruptcy petition seeks some advantage offered in the Code, any other rule would eviscerate any limitation that the good faith requirement places on Chapter 11 filings.

At least one Bankruptcy Court has dismissed for a lack of good faith a Chapter 11 petition seeking primarily to cap a landlord's claim for future rent under § 502(b)(6), *In re Liberate Technologies,* No. 04-31394-TC, 2004 WL 2008956, at *7-*8 (Bankr. N.D. Cal. Sept. 8, 2004), and other Bankruptcy Courts have similarly dismissed Chapter 11 petitions filed merely to take advantage of other

---

[8] The law is clear that the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith. *PPI*, 324 F.3d at 211; *SGL Carbon*, 200 F.3d at 162 n.10. The Bankruptcy Court's statements that "it does not establish bad faith for a debtor to," or "I conclude that as a matter of law, that is not a debilitating fact," erroneously suggest that the question before the court was whether bad faith, rather than good faith, had been proven.

23

singular provisions of the Bankruptcy Code. *See N.W. Place, Ltd. v. Cooper (In re N.W. Place, Ltd.)*, 73 B.R. 978, 982 (Bankr. N.D. Ga. 1987) (Chapter 11 petition filed to invoke trustee's avoidance powers under Bankruptcy Code and to set aside transfer); *In re S. Cal. Sound Sys., Inc.*, 69 B.R. 893, 900 (Bankr. S.D. Cal. 1987) (Chapter 11 petition filed to reject executory contract pursuant to 11 U.S.C. § 365(a)); *In re Cardi Ventures, Inc.*, 59 B.R. 18, 22-23 (Bankr. S.D.N.Y. 1985) (Chapter 11 petition filed to assume and assign lease pursuant to 11 U.S.C. § 365(f)); *In re Nancant, Inc.*, 8 B.R. 1005, 1008 (Bankr. D. Mass. 1981) (Chapter 11 petition filed to have certain tax liability determined pursuant to 11 U.S.C. § 505). For example, 11 U.S.C. § 362 protects debtors by staying litigation against them during the pendency of the bankruptcy. Yet courts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation. *E.g., Dixie Broad.*, 871 F.2d at 1026-27. As one Bankruptcy Court put it:

> The protection of the automatic stay is not *per se* a valid justification for a Chapter 11 filing; rather, it is a consequential benefit of an otherwise good faith filing. A perceived need for the automatic stay, without more, cannot convert a bad faith filing to a good faith one.

*In re HBA East, Inc.*, 87 B.R. 248, 262 (Bankr. E.D.N.Y. 1988). Indeed, if there is a "classic" bad faith petition, it may be one in which the petitioner's only goal is to use the automatic stay provision to avoid posting an appeal bond in another court. *E.g., Marsch*, 36 F.3d at 828.

Integrated and the OCESH may therefore be correct that § 502(b)(6) reflects a Congressional determination that landlords stand to receive a windfall in a bankruptcy, and that landlord claims are inherently speculative. Furthermore, Integrated and the OCESH may be correct that § 502(b)(6) should operate to cap landlord claims, even where the only effect of the cap would be to transfer assets from creditors to equity holders.[9] Yet § 502(b)(6) and the legislative policy underlying that provision assume the existence of a valid bankruptcy, which, in turn, assumes a debtor in financial distress. The question of good faith is therefore antecedent to the operation of § 502(b)(6).

Although the Bankruptcy Code contains many provisions that have the effect of redistributing value from one interest group to another, these redistributions are not the Code's *purpose*. Instead, the purposes of the Code are to preserve going concerns and to maximize the value of the debtor's estate. *203 N. LaSalle*, 526 U.S. at 453; *Toibb*, 501 U.S. at 163-64. Section 502(b)(6) is precisely

---

[9] The Landlord and Amici vigorously argue that § 502(b)(6) does not apply to a solvent debtor.

the sort of provision this Court had in mind when we stated:

> It is easy to see why courts have required Chapter 11 petitioners to act within the scope of the bankruptcy laws to further a valid reorganizational purpose. Chapter 11 vests petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors. When *financially troubled* petitioners seek a chance to remain in business, the exercise of those powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code.

*SGL Carbon*, 200 F.3d at 165 (emphasis added). To be filed in good faith, a petition must do more than merely invoke some distributional mechanism in the Bankruptcy Code. It must seek to create or preserve some value that would otherwise be lost—not merely distributed to a different stakeholder—outside of bankruptcy. This threshold inquiry is particularly sensitive where, as here, the petition seeks to distribute value directly from a creditor to a company's shareholders. *See In re Telegroup Inc.*, 281 F.3d 133, 140 (3d Cir. 2002) (quoting

Elizabeth Warren, *Bankruptcy Policy*, 54 U. Chi. L. Rev. 775, 792 (1987), for the proposition that "[a]n almost axiomatic principle of business law is that, because equity owners stand to gain the most when a business succeeds, they should absorb the costs of the business's collapse—up to the full amount of their investment"); *see also 203 N. LaSalle*, 526 U.S. at 453 (characterizing one of the purposes of Chapter 11 as "maximizing property available *to satisfy creditors*").

As we have explained above, in a smoking gun resolution approved by the Board, and notwithstanding its strong financial position, Integrated authorized a letter to the Landlord threatening that if it did not enter into a settlement of the lease in the amount of at least $8 million, Integrated would file for bankruptcy so as to take advantage of § 502(b)(6), which sharply limits the amount that a landlord can recover in bankruptcy for damages resulting from the termination of a lease.

Taken to its logical conclusion, the OCESH's argument is that any entity willing to undergo Chapter 11 proceedings may cap the claims of its landlord. Nothing in the Bankruptcy Code or its legislative history suggests that § 502(b)(6) was meant to allow tenants to avoid their leases whenever the landlord's state law remedy exceeds the cap under § 502(b)(6) by an amount greater than the cost of proceeding through a Chapter 11 reorganization or liquidation. Such a rule would not only obviate the need for a good faith requirement, but would be antithetical to the structure and purposes of

the Bankruptcy Code.

## III.

We hold that both the District Court and the Bankruptcy Court erred as a matter of law in concluding that Integrated suffered financial distress. Although Integrated's business model had failed, the company had no significant debt apart from the Landlord's claim. Moreover, the record demonstrates that the securities class action did not present a significant threat to Integrated's finances. Because Integrated was not in financial distress, its Chapter 11 petition was not filed in good faith as it could not—and did not—preserve any value for Integrated's creditors that would have been lost outside of bankruptcy. We will therefore reverse the order of the District Court affirming the Bankruptcy Court's denial of the Landlord's motion to dismiss, and will remand this case to the Bankruptcy Court with instructions to dismiss Integrated's petition.